**ORIGINAL**

1  Gary D. Leasure (Cal. State Bar No. 211160)
   Law Office of Gary D. Leasure, APC
2  12625 High Bluff Drive, Suite 103
   San Diego, California 92130
3  Telephone: (858) 720-1992, Ext. 202
   Facsimile: (858) 720-1990
4  *Local Counsel for Plaintiffs*

5  Jim Bopp, Jr. (Ind. State Bar No. 2838-84)*
   Joe La Rue (Ohio State Bar No. 80643)*
6  BOPP, COLESON & BOSTROM
   1 South 6th Street
7  Terre Haute, Indiana 47807
   Telephone: (812) 232-2434
8  Facsimile: (812) 235-3685
   *Lead Counsel for Plaintiffs*

9

   * *Pro hac vice application to be filed when docket number is available.*
10

FILED

09 DEC 21  PM 3: 57

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY_____ DEPUTY

11              **UNITED STATES DISTRICT COURT**
12           **FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

13  **Phil Thalheimer; Associated Builders &**
    **Contractors PAC sponsored by Associated**
14  **Builders & Contractors, Inc. San Diego**
    **Chapter; Lincoln Club of San Diego**
15  **County;  Republican Party of San Diego;**
    **and John Nienstedt, Sr.**
16
                                      **Plaintiffs,**
17
     v.                                             '09 CV 2862 IEG      WMc
18
    **City of San Diego**; City of San Diego Ethics   Case: _____
19  Commissioners **Richard M. Valdez**, Chair,
    **W. Lee Biddle, Guillermo ("Gil") Cabrera,**   **Verified Complaint**
20  **Clyde Fuller, Dorothy Leonard**, and **Larry S.**
    **Westfall**, all sued in their official capacity; **The**
21  **Honorable Jerry Sanders**, Mayor of San
    Diego, sued in his official capacity; **Jan**
22  **Goldsmith**, City Attorney for the City of San
    Diego, sued in his official capacity; and
23  **Elizabeth Maland**, City Clerk of San Diego,
    sued in her official capacity,
24
                                      **Defendants.**
25

26      Plaintiffs Associated Builders & Contractors PAC sponsored by Associated Builders &

27  Contractors, Inc. San Diego Chapter ("ABC PAC"), the Lincoln Club of San Diego County

28



1  ("Lincoln Club"), Republican Party of San Diego County ("RPSD"), Phil Thalheimer, and John

2  Nienstedt, Sr. (together, "Plaintiffs"), complain as follows:

3  **Introduction**

4       1.      The Plaintiffs bring this action to defend their First Amendment right under the

5  United States Constitution to engage in political speech and association.

6       2.      Article 7, Division 29 of the San Diego Municipal Code, known as the SAN DIEGO

7  MUNICIPAL ELECTION CAMPAIGN CONTROL ORDINANCE ("ECCO"), imposes certain restrictions and

8  prohibitions on financial contributions to candidates for public office, independent expenditures,

9  and electioneering communications.

10      3.      The Plaintiffs believe some of these restrictions and prohibitions are impermissible

11  under the First Amendment to the United States Constitution and so violate their constitutional

12  rights.

13      4.      At issue in this lawsuit is the constitutionality of ECCO §§ **27.2935** (limits of $500

14  on contributions to candidates), **27.2936** (expenditure limit on committees, including political

15  parties, making independent expenditures as well as a de facto contribution limit for contributions

16  to those committees), **27.2938** (ban on solicitation or acceptance of contributions prior to 12 months

17  before the primary election, and also prohibiting candidates from spending their own money in

18  support of their candidacy more than 12 months before the primary), **27.2950** (ban on contributions

19  from political parties to their own candidates, as well as a ban on candidates soliciting or accepting

20  contributions from organizations), and **27.2951** (ban on accepting contributions for certain political

21  speech activity that are not drawn against a checking account or credit card belonging to an

22  *individual*).

23  **Jurisdiction and Venue**

24      5.      This action arises under 42 U.S.C. § 1983, 42 U.S.C. § 1973 et. seq., and the First and

25  Fourteenth Amendments to the Constitution of the United States.

26      6.      The jurisdiction of this Court over claims arising under 42 U.S.C. § 1983 and 42

27  U.S.C. § 1973 is founded upon 28 U.S.C. § 1343(a). The jurisdiction over claims arising under the

28

VERIFIED COMPLAINT                                    2                    *Thalheimer v. City of San Diego*

1   First and Fourteenth Amendments is founded upon 28 U.S.C. §§ 1331 and 1343(a).

2       7.    Venue is proper in this district under 28 U.S.C. § 1391(b)(2) because the events and

3   occurrences giving rise to the claim occurred within the Southern District of California.

4       8.    Venue is also proper in this district under 28 U.S.C. § 1391(b)(1) because the

5   Defendants reside in the Southern District of California.

6   **Parties**

7   **A. Plaintiffs**

8   **(1) Plaintiff Phil Thalheimer**

9       9.    Mr. Thalheimer is a resident of San Diego, and has previously run for a city council

10  seat in Council District 1. He is considering another run for a council seat, either in Council District

11  1 or else in a to-be-formed Council District 9, if it is formed and if he lives within it.

12  **(2) Plaintiff ABC PAC**

13      10.    Plaintiff ABC PAC is a committee formed by Associated Builders & Contractors, Inc.

14  San Diego Chapter to advance the merit shop philosophy in San Diego and Imperial Counties

15  through political action. It is properly registered with the State of California as a political action

16  committee.

17      11.    ABC PAC supports candidates and ballot measures that support fair and open

18  competition for every construction project, and oppose candidates and ballot measures that impose

19  "union only" requirements on any construction project.  They also support ballot measures that

20  encourage local control of prevailing wage decisions, and candidates and ballot measures that

21  otherwise help advance their merit shop apprentice programs.  Additionally, they inform their

22  members of critical political issues that impact their freedom to work in a merit shop community.

23  **(3) Plaintiff Lincoln Club**

24      12.    Lincoln Club is an influential organization of politically like-minded business and

25  civic leaders throughout the county. It is properly registered with the State of California as a political

26  action committee. Its mission is to advance leadership that shares their commitment to fiscally

27  responsible public policy, the expansion of economic opportunity, and an enhanced quality of life

28

1   throughout San Diego County.

2       13.     In furtherance of its mission, Lincoln Club makes independent expenditures in

3   support of, or opposition to, candidates of its choice.

### (4) Plaintiff San Diego County Republican Party

5       14.     Plaintiff Republican Party of San Diego County ("RPSD") is San Diego's local

6   organization for the Republican Party.

### (5) Plaintiff John Nienstedt

8       15.     Mr. Nienstedt is a life-long resident of San Diego.  He is registered to vote in San

9   Diego, and actively supports candidates for office that he feels would be good for San Diego and the

10  interests he cares about.  He intends to contribute the full amount allowed by law to the candidate(s)

11  of his choice in upcoming San Diego city council and/or citywide elections.  He also wants to

12  contribute to a committee that makes independent expenditures in support of the candidate of his

13  choice, but cannot, because of the challenged law.

### B. Defendants

15      16.     Together, all the defendants as enumerated below shall be called "defendants" or

16  "City."

### (1) The City of San Diego

18      17.     As a Charter City, San Diego has the authority to make and enforce its own municipal

19  laws. CALIFORNIA CONSTITUTION, Art. 11, Sec. 5(a).

20      18.     All of the laws challenged in this lawsuit are laws of the City of San Diego, and part

21  of the San Diego Municipal Election Campaign Control Ordinance (ECCO).  They have been

22  enacted by governing body of the City of San Diego, and apply to activities in San Diego.

23      19.     The City of San Diego is thus a proper defendant to this lawsuit.

### (2) The Members of the San Diego Ethics Commission, in Their Official Capacities

25      20.     Mr. Richard M. Valdez, Chair, along with W. Lee Biddle, Guillermo Cabrera, Clyde

26  Fuller, Dorothy Leonard, and Larry S. Westfall are the current members of the San Diego Ethics

27  Commission.

28

VERIFIED COMPLAINT                    4                    *Thalheimer v. City of San Diego*

1    21.    "Enforcement Authority" is defined by ECCO to mean "the City of San Diego Ethics
2    Commission."  ECCO, § 27.2903.

3    22.    The City Clerk is charged by ECCO to report, at his or her discretion, "apparent
4    violations" of ECCO to "the Enforcement Authority" (that is, the Ethics Commission).  ECCO, §
5    27.2985(c).  Also, private citizens may file complaints with the Ethics Commission.  ECCO, §
6    27.2990(a).

7    23.    The Ethics Commission "shall have such investigative powers as are necessary for
8    the performance of the duties prescribed in this division."  They also "may demand and shall be
9    furnished records of campaign contributions and expenses at any time."  ECCO, § 27.2990(b).

10    24.    The Ethics Commission "may elect to enforce the provisions of this division
11    administratively" or "may otherwise recommend or refer enforcement actions to the City Attorney
12    or other law enforcement agency with jurisdiction."  ECCO, § 27.2990(c).

13    25.    Because the San Diego Ethics Commission has enforcement power for all the laws
14    challenged in this lawsuit, its members—namely, W. Lee Biddle, Guillermo Cabrera, Clyde Fuller,
15    Larry S. Westfall, Dorothy Leonard, and Larry S. Westfall (along with the Chair, Mr. Richard M.
16    Valdez) (together, **"Commission"**)—are being sued in their official capacities.

17    **(3) The Honorable Jerry Sanders, Mayor of San Diego, in His Official Capacity**

18    26.    The Honorable Jerry Sanders is the duly elected Mayor of San Diego.

19    27.    On January 1, 2006, the City of San Diego's system of government changed from a
20    City Manager form to a Strong Mayor form, in which the Mayor is the Chief Executive Officer of
21    San Diego, and is charged by the Charter to "execute and enforce all laws, ordinances, and policies
22    of the City."  Charter, Art. XV, § 265(b)(1), (2).  This includes assuming and carrying out "all
23    executive authority, power, and responsibilities [previously] conferred upon the City Manager,"
24    which in turn includes the enforcement of the various laws challenged in this lawsuit.

25    28.    Because the Mayor is responsible to "execute and enforce" all the laws challenged
26    in this lawsuit, the Honorable Jerry Sanders (**"Mayor"**) is being sued in his official capacity.

27

28

**(4) Jan Goldsmith, City Attorney of San Diego, in His Official Capacity**

29.    Jan Goldsmith is the duly elected City Attorney of the City of San Diego.

30.    ECCO § 27.2903 provides a definition for "enforcement authority" as it relates to ECCO, which says "Nothing in this article limits the authority of the City Attorney, any law enforcement agency, or any prosecuting attorney to enforce the provisions of this articule under any circumstances where the City Attorney, law enforcement agency, or prosecuting attorney otherwise has lawful authority to do so."

31.    The San Diego Charter provides as follows:

> "The City Attorney shall be the chief legal adviser of, and attorney for the City and all Departments and offices thereof in matters relating to their official powers and duties... It shall be the City Attorney's duty, either personally or by such assistants as he or she may designate, to perform all services incident to the legal department; to give advice in writing when so requested, to the Council, its Committees, the Manager, the Commissions, or Directors of any department [and] to prosecute or defend, as the case may be, all suits or cases to which the City may be a party. ... The City Attorney shall ... prosecute persons charged with or guilty of the violations of the state laws occurring within the city limits of The City of San Diego for offenses constituting misdemeanors."

Charter §§ 40, 40.1.

32.    Because the City Attorney thus has "lawful authority" to enforce all of the laws challenged in this lawsuit, he is being sued in his official capacity.

**(5) Elizabeth Maland, City Clerk of San Diego, in Her Official Capacity**

33.    Elizabeth Maland is the City Clerk of San Diego.

34.    ECCO § 27.2985 charges the City Clerk to report, at his or her discretion, "apparent violations" of ECCO to "the Enforcement Authority." ECCO, § 27.2985(c). She is also charged to "cooperate with the Enforcement Authority in the performance of the duties of the Enforcement Authority as prescribed in this division and applicable state law." ECCO, § 27.2985(e).

35.    Ms. Maland (**"City Clerk"**) is being sued in her official capacity.

## Statement of Facts

36.    The San Diego Municipal Election Campaign Control Ordinance ("ECCO") governs elections and related activity in San Diego.

1       37.    ECCO was added to the San Diego Municipal Code on April 10, 1973.  It defines its

2  "purpose and intent" as follows:

> It is the purpose and intent of the City Council of the City of San Diego in enacting
> this division to preserve an orderly political forum in which individuals may express
> themselves effectively; to place realistic and enforceable limits on the amounts of
> money that may be contributed to political campaigns in municipal elections; to
> prohibit contributions by organizations in order to develop a broader base of political
> efficacy within the community; to limit the use of loans and credit in the financing
> of municipal election campaigns; to provide full and fair enforcement of all the
> provisions of this division; to avoid the corruption or the appearance of corruption
> brought about when candidates for elective City office accept large campaign
> contributions; and to avoid the corruption or the appearance of corruption brought
> about when large campaign contributions are made to support or oppose the recall of
> an individual holding elective City office.

ECCO, § 27.2901.

### Facts Related to Plaintiff ABC PAC

38.    ABC PAC makes independent expenditures, as that term is defined in ECCO, § 27.2903.[1]

39.    ABC PAC wants to solicit, accept, and use contributions received from non-individuals, such as trusts, corporations and other business entities, for their independent expenditures in support of, or opposition to, candidates of their choice.  They would do so, but for ECCO § 27.2936(b).

40.    For the past several years, ABC PAC has received contributions from contributors

---

[1]ECCO § 27.2903 defines "independent expenditure" as follows:

> Independent expenditure mans any expenditure made by any person in connection
> with a communication that:
>
> (a)    expressly advocates the nomination, election, defeat, or recall of a clearly
> identified candidate; or
>
> (b)    expressly advocates the qualification, passage, or defeat of a clearly identified
> measure; or
>
> (c)    taken as a whole and in context, unambiguously urges a particular result in
> a City election.

1  in excess of $500. They would like to use the full amount of these contributions for independent

2  expenditures. They would also like to solicit and accept other contributions from other contributors

3  in amounts greater than $500, and use as much of those contributions as possible for the purpose of

4  making independent expenditures. They would do so, but for ECCO § 27.2936, which limits their

5  independent expenditures to an amount not greater than what can be attributed to contributions of

6  $500 or less from individual (human) contributors.

7  **Facts Related to Plaintiff Lincoln Club**

8  41.    The Lincoln Club's vision "is one of a county wherein taxes are low, government is

9  small and accountable, children receive a world-class education, regulations are reasonable and

10  business is encouraged."[2]

11  42.    The Lincoln Club's mission "is to advance free market principles and ideas by

12  recruiting, endorsing, and financing business-friendly candidates and ballot measures that reflect our

13  commitment to responsible public policy, the expansion of economic opportunity, and an enhanced

14  quality of life throughout San Diego County."[3]

15  43.    The Lincoln Club "identifies and supports candidates, elected officials, and policies

16  at every level of government. [They] measure these leaders and issues based on [their] core

17  philosophy of a fiscally responsible government."[4]

18  44.    Lincoln Club makes independent expenditures as that term is defined in ECCO §

19  27.2903 in support of, or opposition to, candidates of its choice.

20  45.    Lincoln Club wants to make independent expenditures in support of candidates in

21  amounts greater than can be attributed "to an individual in an amount that does not exceed $500 per

22  _____

23  [2]Lincoln    Club    of    San    Diego:    "Vision    and    Mission,"   *available    at*

24  http://web.memberclicks.com/mc/page.do?orgId=lcsdc&sitePageId=49488 (*last visited* November 20, 2009).

25  [3]*Id.*

26  [4]Lincoln    Club    of    San    Diego:    "Fact    Sheet,"   *available    at*

27  http://web.memberclicks.com/mc/page.do?orgId=lcsdc&sitePageId=49480 (*last visited* November 20, 2009).

28

1   candidate per election," as ECCO § 27.2936(b) requires.  It would do so, but for the law.

2       46.     Lincoln Club also wants to solicit, accept, and use contributions received from non-

3   individuals, such as trusts, corporations and other business entities, for their independent

4   expenditures in support of, or opposition to, candidates of their choice.  They would do so, but for

5   ECCO § 27.2936(b).

6                       **Facts Related to Plaintiff Republican Party of San Diego (RPSD)**

7       47.     In California, political parties are permitted to make unlimited contributions to local

8   candidates where local law does not impose limitations.  CALIFORNIA GOVERNMENT CODE § 85312.

9       48.     RPSD has an active program to endorse and support local candidates using member

10  communications and where available, direct contributions.

11      49.     RPSD would like to give financial support to Republican candidates for local office

12  in San Diego, and make coordinated expenditures with their candidates, and would do so, but for

13  ECCO § 27.2950, which bans contributions from organizations (including political parties) to

14  candidates.

15                            **Facts Related to Plaintiff Phil Thalheimer**

16      50.     Mr. Thalheimer is a resident of San Diego.  He has previously been a candidate for

17  city council in Council District 1.

18      51.     A ballot question will be put to San Diego's voters next June, 2010, giving them the

19  opportunity to decide whether to add a ninth city council seat to their city council.[5]  This is a result

20  of the passage of "Proposition B" in June 2008, which asked, "Shall the voters approve an

21  amendment to the Charter to require the City Council to submit to voters at the June 2010 election

22  Charter amendments making the Strong Mayor form of government permanent; adding a Council

23  seat; and, when the ninth seat is filled, increasing the Council votes required to override a mayoral

24

25  _____

26          [5] See Gene Cubbison, *Voters to Decide on City Council Addition*, nbcsandiego.com (October

27  14, 2009) (*avaiable at* http://www.nbcsandiego.com/news/politics/-
    Number-Nine-New-SD-Council-District-a-Ballot-Question-64301472.html) (*last visited* November

28  3, 2009) (attached as Exh. 1).

veto?"[6]

52.     The overwhelming support Proposition B received last June, with over 76% of the electorate agreeing that the question of a new Council seat should be put to the voters,[7] makes Mr. Thalheimer optimistic that a new council district will be created. If so, its first council member will be elected in 2012.

53.     If the voters decide to create a new council seat, the Redistricting Commission will have to determine the boundaries for the district. The City Charter requires San Diego to create a Redistricting Commission at the beginning of each decade, in order to evaluate and adjust the boundaries of city council districts to reflect changes in population. Charter, Art. II, §§ 4 – 5.1 (*available at* http://docs.sandiego.gov/citycharter/Article%20II.pdf) (last visited November 3, 2009)).

54.     According to the City of San Diego Redistricting Commission's website, "The Charter requires that districts be comprised of contiguous territory and made as equal in population as shown by the census reports, and as geographically compact as possible. It also requires that the districts shall, as far as possible, be bounded by natural boundaries, street lines, and/or City boundary lines. ... The next Commission is expected to begin its work in 2010."[8]

55.     Mr. Thalheimer believes that if the voters decide to create a new city council district, it is likely that he will live within its boundaries. Because this would be a new seat, there would not be an incumbent in the election. Mr. Thalheimer is considering running for the seat, if in fact it is created and he lives within the district.

56.     Regardless of whether the voters create a new city council district, the Redistricting Commission will still evaluate and adjust the boundaries of city council districts to reflect changes

---

[6]*See* Smart Voter Summary, *Proposition B—Permanency Of The Strong Mayor Form Of Governance, City of San Diego* (*available at* http://www.smartvoter.org/2008/06/03/ca/sd/prop/B/) (last visited November 3, 2009) (attached as Exh. 2).

[7]*Id.*

[8]City of San Diego Redistricting Commission, *available at* http://www.sandiego.gov/redistricting/about.shtml#bound (last visited November 16, 2009)).

1   in population. Charter, Art. II, §§ 4 – 5.1[9]

2   57.   Mr. Thalheimer believes it is likely that he will still live within Council District 1

3   after the Redistricting Commission finishes its work, if a new ninth district is not created.

4   58.   Council District 1 is served by Council Woman Sherry Lighter. She will likely run

5   as the incumbent in the 2012 election.

6   59.   Despite the fact that running against an incumbent presents additional challenges

7   because of her name recognition as an elected official and the current limits and prohibitions on

8   contributions candidates are able to solicit and accept, Mr. Thalheimer is considering running for city

9   council again out of Council District 1, if the voters do not create a new ninth district.

10   60.   However, he is not certain that he would run against an incumbent, because his past

11   experience makes him believe that he may not be able to raise the finances needed to mount an

12   effective campaign under the contribution limits imposed by ECCO.

13   61.   In preparation for these contingencies, Mr. Thalheimer has created a committee and

14   would like to begin soliciting money to be placed in account for a possible council run in 2012.

15   However, he is prohibited from doing so by ECCO § 27.2938(a), which provides that "It is unlawful

16   for any candidate or controlled committee seeking elective City office to solicit or accept

17   contributions prior to the twelve months preceding the primary election for the office sought." Mr.

18   Thalheimer would solicit contributions for his campaign, but for this law.

19   62.   Mr. Thalheimer also wants to use his own money to begin advertising his potential

20   candidacy so as to build name-recognition among the electorate and excitement for his potential

21   campaign.

22   63.   However, he cannot do so, because the Commission interprets ECCO § 27.2938(a)

23   as prohibiting a candidate from contributing his own money to his own campaign more than a year

24

25

26

_____

27   [9]Charter, *available at* http://docs.sandiego.gov/citycharter/Article%20II.pdf (last visited
November 3, 2009)).

28

VERIFIED COMPLAINT                              11                     *Thalheimer v. City of San Diego*

1     prior to the primary election.[10]

2         64.     Thus, Mr. Thalheimer is not allowed to do such things as create a website, print

3 flyers, or mail letters to announce his candidacy and garner name recognition, even though he would

4 use his own money to do so. Mr. Thalheimer would spend his own money to engage in these types

5 of activities, but for the Commission's interpretation of this law.

6         65.     Mr. Thalheimer intends to solicit contributions from diverse types of contributors,

7 including some who own their own businesses. As sole proprietors, some of these potential

8 contributors co-mingle their personal money and their business money in their business checking

9 account. However, Mr. Thalheimer is barred by ECCO §§ 27.2950 and 27.2951 from accepting

10 contributions from business checking accounts, even if the account is that of a sole proprietor.[11]

11         66.     Mr. Thalheimer wants to solicit, accept, and use contributions from various

12 organizational entities like sole proprietorships, partnerships, LLPs, LLCs taxed as partnerships,

13 APCs, trusts, labor unions, and PACs. He would do so, but for ECCO §§ 27.2936(b), 27.2950 and

14 27.2951, which make it unlawful to solicit or accept contributions from organizations.

15                 **Facts Related to Plaintiff John Nienstedt**

16         67.     Mr. Nienstedt is a life-long resident of San Diego, and is registered to vote in San

17 Diego. He has contributed in the past to candidates with whom he agreed on the issues and who he

18 believed would be good for San Diego. He intends to contribute financially to the candidate(s) of

19 his choice in upcoming San Diego city council and citywide elections.

20         68.     Mr. Nienstedt would like to contribute more than $500 to candidates he likes in

21 upcoming election cycles. He would do so, but for ECCO § 27.2935, which imposes a contribution

22 limit of $500 per candidate per election.

23       _____

24        [10]*See* San Diego Ethics Commission Informal Advice Letter No. IA06-11, (December 5,

25 2006), at 2, *available at* http://www.sandiego.gov/ethics/pdf/IA06_11.pdf (last visited August 10, 2009) (attached as Exh. 3).

26        [11]In addition to the code provisions cited, *see* San Diego Ethics Commission Informal Advice

27 Letter No. IA03-05 (June 17, 2003), *available at* http://www.sandiego.gov/ethics/pdf/ia03-05.pdf (last visited November 4, 2009) (attached as Exh. 4).

28

69.   In addition to contributing to candidates he supports, Mr. Nienstedt would also like to contribute to a committee that makes independent expenditures, and have his contribution used to support his chosen candidate. But, ECCO § 27.2935(a) makes it unlawful for him to contribute more than $500 total to candidates, and then make a contribution to a committee and earmark it for independent expenditures in support of his chosen candidate. He would do so, but for this law.

70.   Mr. Nienstedt supports a candidate whose primary is more than a year away. He would like to contribute money to this candidate's campaign now, and would do so, but for ECCO § 27.2938(a) which makes it unlawful for candidates to "accept contributions prior to the twelve months preceding the primary election for the office sought."

## Count 1—Candidates Are Prohibited From Using Their Own Money More Than a Year Before the Primary

71.   Plaintiffs re-allege and incorporate by reference all of the allegations contained in all of the preceding paragraphs.

72.   Plaintiff Phil Thalheimer wants to spend his own money to prepare materials to announce his potential candidacy and begin to garner name recognition among the electorate. He would do so, but for ECCO § 27.2938(a), as construed and enforced by the Commission.

73.   ECCO § 27.2938(a) provides:

> It is unlawful for any candidate or controlled committee seeking elective City office to solicit or accept contributions prior to the twelve months preceding the primary election for the office sought.

74.   The Commission construes this language to mean that a candidate is prohibited from using even *his own money* for any activity that would announce or assist his campaign more than 12 months prior to the primary election.[12]

75.   Because it is more than 12 months before the primary, Mr. Thalheimer cannot spend his own money in ways that would further his campaign.

---

[12]*See* San Diego Ethics Commission Informal Advice Letter No. IA06-11, (December 5, 2006), at 2, *available at* http://www.sandiego.gov/ethics/pdf/IA06_11.pdf (last visited August 10, 2009) (attached as Exh 3).

VERIFIED COMPLAINT                    13                    *Thalheimer v. City of San Diego*

76.   Specifically, the Commission has stated that:

> An individual may not spend personal funds in support of his or her candidacy prior to [12 months prior to the primary], unless such spending is solely related to "exploratory" activities. Such activities involve gathering information that an individual may use to decide whether or not to run for office. Activities designed to promote an individual's qualifications or otherwise advocate that individual's bid for elective office are not considered "exploratory."[13]

The Commission has also stated:

> An individual may not spend personal funds prior to [12 months prior to the primary], on literature if that literature expressly or *impliedly* advocates for his or her election. For example, a person's list of qualifications or achievements need not mention a particular elective office or election date in order to imply that the person is qualified for office.[14]

77.   This interpretation acts as an impermissible expenditure limit on candidates who want to spend their own resources in support of their candidacies.

78.   Limits on candidates' expenditures of their personal funds are unconstitutional. *Id.* at 54. *Buckley v. Valeo*, 424 U.S. 1, 52–54 (1976); *Davis v. Fed. Election Comm'n*, 554 U.S. ___, 128 S.Ct. 2759, 2771 (2008) (noting that candidates have a First Amendment right to "engage in unfettered political speech" and to do so "robustly"); *Randall v. Sorrell*, 548 U.S. 230, 236 (2006) (stating that "well-established precedent" leads to the result that limits on how much a candidate may spend necessarily violate the First Amendment).

79.   ECCO § 27.2938(a) impermissibly places a legislative limit on Mr. Thalheimer's ability to speak on behalf of his own candidacy. It burdens and chills the speech rights of Mr. Thalheimer and all other candidates similarly situated. It cannot pass applicable scrutiny, and is overbroad. It is therefore unconstitutional, both facially and as applied to the plaintiffs.

## Count 2—Candidates Are Prohibited From Soliciting, Accepting and Spending Contributions—And, Supporters Are Prohibited From Contributing to Candidates---More than a Year Before the Primary

80.   Plaintiffs re-allege and incorporate by reference all of the allegations contained in all

---

[13]*Id.* at 2 (emphasis in original).

[14]*Id.*

of the preceding paragraphs.

81.     Plaintiff Phil Thalheimer is considering a run for City Council in 2012, and has formed a committee for that purpose.  The primary for this race is more than 12 months from now.

82.     Mr. Thalheimer wants to solicit and accept contributions to his campaign now, and would do so, but for ECCO § 27.2938(a), which makes it "unlawful for any candidate or controlled committee seeking elective City office to solicit or accept contributions prior to the twelve months preceding the primary election for the office sought." Mr. Thalheimer also wants to spend some of the contributions he would solicit and accept, if allowed, *now*, rather than waiting until a year before his primary. He would do so, but for this law.

83.     Mr. Nienstedt wants to contribute financially to the candidate(s) of his choice now, rather than waiting until within a year of the primary.  He would do so, but for ECCO § 27.2938(a).

84.     The Supreme Court recognized contribution limits "implicate fundamental First Amendment interests." *Buckley*, 424 U.S. at 23. *See also Randall v. Sorrell*, 548 U.S. 230, 241 (2006) (same).  The Court identified those interests as the freedoms of "political expression" and "political association." *Buckley*, 424 U.S. at 15. Contributions serve as "a general expression of support for the candidate and his views." *Id.* at 21. "Making a contribution, like joining a political party, serves to affiliate a person with a candidate." *Buckley*, 424 U.S. at 22. Contribution limits are thus only permissible if the government demonstrates that the limits are "closely drawn" to match a "sufficiently important interest." *Randall*, 548 U.S. at 247 (quoting *Buckley*, 424 U.S. at 25).

85.     ECCO's complete ban on contributions prior to 12 months before the primary impermissibly burdens and chills the speech and associational rights of Mr. Nienstedt and other contributors, as well as Mr. Thalheimer and other candidates.  ECCO § 27.2938(a) is not closely drawn to a sufficiently important interest, and so cannot pass constitutional scrutiny.  It is also unconstitutionally overbroad, burdening substantially more associational and speech rights than are justified by the proffered anti-corruption interest. ECCO § 27.2938(a) is therefore unconstitutional, both facially and as applied to the plaintiffs.

## Count 3—$500 Total Contribution Limit In Support of Candidates

86.   Plaintiffs re-allege and incorporate by reference all of the allegations contained in all of the preceding paragraphs.

87.   ECCO § 27.2935 makes it "unlawful for an individual to make to any candidate or committee supporting or opposing a candidate, or for any candidate or committee supporting or opposing a candidate to solicit or accept, a contribution that would cause the total amount contributed by that individual to support or oppose the candidate to exceed $500 for any single election."

88.   Mr. Nienstedt intends to contribute to candidate(s) of his choice for city council in the 2010 election cycle.  He would like to make a contribution greater than $500 to the candidate(s) of his choice, and would do so, but for ECCO § 27.2935.

89.   Mr. Nienstedt would also like to contribute to a committee that makes independent expenditures in support of the candidates of his choice.  However, because he intends to contribute the maximum amount allowed to the candidates (and would like to contribute more than that, if allowed by law to do so), he cannot contribute to committees that support those candidates.  This is because ECCO § 27.2935(a) makes it unlawful for him to contribute more than $500 total to candidates and committees that support them.  Thus, if he gives $500 to a candidate, as he is allowed by law to do, he cannot contribute anything to committees that support that candidate.

90.   Plaintiff Phil Thalheimer is considering a run for City Council in 2012.  He wants to begin soliciting and accepting contributions to place in account as he prepares for this contingency.  He would like to solicit and accept contributions greater than the $500 limit imposed by ECCO § 27.2935, and would do so, but for the law.

91.   Mr. Thalheimer is an experienced candidate, who has run competitively for election to city council before.

92.   If the council districts are not re-drawn, Mr. Thalheimer will likely be running against an incumbent.  Based on his past experience, Mr. Thalheimer believes that the contribution limits imposed by ECCO § 27.2935 will prevent him from mounting an effective campaign against an

incumbent, and thus are "too great" of a "constitutional risk[] to the democratic electoral process." *Randall*, 548 U.S. at 248–49.

93.     Contribution limits must be "closely drawn" to a "sufficiently important interest," or else they abridge First Amendment freedoms. *McConnell v. FEC*, 540 U.S. 93, 231 (2003); *Buckley* 424 U.S. at 25.

94.     The only interest so far found sufficiently important to justify limits on contributions to candidates and their campaigns is the interest in preventing corruption and the appearance of corruption associated with *large* contributions. *McConnell*, 540 U.S. at 138; *Nixon v. Shrink Mo. Gov't. PAC*, 528 U.S. 377, 393 (2000) (*"Shrink PAC"*); *Federal Election Comm'n v. National Right to Work Comm.*, 459 U.S. 197, 198-199, and n. 1 (1982); *Buckley*, 424 U.S. at 26–27.

95.     There is no corruption interest in San Diego that would justify limits this low. One of the commissioners has suggested that the Commission really does not know the "basis" for contribution limits in San Diego.[15]

96.     Another commissioner suggested that limits were needed because, without them, there would be an "appearance" of corruption.[16]

97.     The Ethics Commission discussed what the appropriate contribution limit should be, in order to eliminate the appearance of corruption while still allowing candidates to amass the resources necessary to mount effective campaigns, from at least November 2007 until taking a vote in May 2008.[17] They heard testimony concerning what limit would accomplish their goals.[18]

98.     The Ethics Commission voted in May, 2008 to recommend contribution limits of $1,000 to the City Council for approval. The motion carried, with four of the six commissioners who

---

[15]City of San Diego Ethics Commission, Minutes for Meeting of Thursday, May 8, 2008, at 4 (*available at* http://www.sandiego.gov/ethics/minutes/080508.pdf) (last visited December 15, 2009) (attached as Exhibit 5).

[16]*Id.* at 5.

[17]*Id.* at 4.

[18]*Id.* at 5.

voted voting in favor.[19]

99.    Thus, the body that is responsible "to monitor, administer, and enforce the City's governmental ethics laws[ and] propose new governmental ethics law reforms"[20] considered testimony and debated for at least 7 months what the appropriate contribution limit should be.  And, that body determined that a $1,000 contribution limit would eliminate the appearance of corruption.

100.    The $500 contribution limit imposed by ECCO § 27.2935 is thus not closely drawn to a sufficiently important interest, but is overinclusive (reaching more speech than the interest will justify). It is also constitutionally overbroad, because it burdens "substantially" more associational and speech rights than are justified by the proffered anti-corruption interest. *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973).

101.    When limits are too low, as they are here, there must be some *special* justification for them if they are to have the potentiality of being upheld as constitutional. *Randall*, 548 U.S. at 261. Yet, there is no justification, special or otherwise, for the low limits imposed by ECCO § 27.2935.

102.    The limits in ECCO § 27.2935 also mute the voice of political parties like RPSD, since they completely ban contributions from political parties to their candidates.  The Court in *Randall* found the limits unconstitutional when they merely limited the political parties to the *same contribution amount* as individuals.  *Id.* at 256.  ECCO § 27.2935, on the other hand, *bans* party contributions altogether.

103.    The limits also impede the ability of challengers like Mr. Thalheimer to mount effective campaigns against incumbents.

104.    The limits therefore fail the so-called *Randall*-analysis set down by the Court in *Randall v. Sorrell*, and should be held unconstitutional.

105.    The limits also impermissibly limit the amount one may contribute to independent

---

[19]*Id.* at 6.

[20]San Diego Municipal Code, Ch. 2, Art. 6, Div. 4, § 26.0401 (*available at* http://docs.sandiego.gov/municode/MuniCodeChapter02/Ch02Art06Division04.pdf) (last visited December 15, 2009).

expenditure committees. One may only contribute $500, total, to candidates and committees that support them. Thus, if Mr. Nienstedt supports candidate X, and gives him the full amount allowed, he may not then make a contribution to a committee for the purpose of making independent expenditures in support of candidate X.

106.    The regulation of contributions to independent expenditure committees "does not fit within the anti-corruption rationale, which constitutes the sole basis for regulating campaign contributions and expenditures." *Emily's List v. FEC*, 581 F.3d 1, 11 (D.C. Cir. 2009). Indeed, "[T]he Court has *never* held that it is constitutional to apply contribution limits to political committees that make solely independent expenditures." *North Carolina Right to Life, Inc. v. Leake*, 525 F.3d 274 (4th Cir.2008) (*NCRL III*). *See also Emily's List*, 581 F.3d at 11 (quoting with approval *NCRL III*).

107.    Thus, the contribution limits imposed by ECCO § 27.2935 simply cannot stand. They impermissibly burden and chill the speech and associational rights of Mr. Nienstedt and other contributors, as well as Mr. Thalheimer and other candidates, as well as Lincoln Club and other committees that make independent expenditures. They are not closely drawn to a sufficiently important interest, and so cannot pass constitutional scrutiny. They are also overbroad, burdening substantially more associational and speech rights than are justified by the proffered anti-corruption interest.

108.    Even if the contribution limits imposed by ECCO § 27.2935 were not overbroad, and were closely drawn to a sufficiently important interest, they would still fail constitutional scrutiny because they "impose burdens upon First Amendment interests that (when viewed in light of the statute's legitimate objectives) are disproportionately severe." *Randall*, 548 U.S. at 237. They both prevent candidates from amassing the resources necessary to mount an effective campaign and also magnify the advantages of incumbency to the point where they put challengers to a significant disadvantage.

109.    ECCO § 27.2935 is therefore unconstitutional, both facially and as applied to the plaintiffs.

## Count 4—Political Parties Are Prohibited From Contributing To Their Candidates

110.    Plaintiffs re-allege and incorporate by reference all of the allegations contained in all of the preceding paragraphs.

111.    RPSD would like to give financial support to Republican candidates for local office in San Diego, and make coordinated expenditures with their candidates, and would do so, but for ECCO § 27.2950, which bans contributions from organizations (including political parties) to candidates, and ECCO § 27.2951, which makes it unlawful for the RPSD to write a check from its account for a contribution.

112.    The Supreme Court has recognized that when limits on what a party may contribute to its own candidates are too severe, the right to associate in a political party is threatened. *Randall*, 548 U.S. at 256. Such limits "severely limit the ability of a party to assist its candidates' campaigns by engaging in coordinated spending . . . . [a]nd, to an unusual degree, [] discourage those who wish to contribute small amounts of money to a party . . . ." *Id.* at 257. Severe limits on the contributions of political parties to their own candidates "reduce the voice of political parties . . . to a whisper." *Id.* at 259.

113.    The limits in *Randall* were held unconstitutional when the political parties were limited to contributing the same amount as an individual could. *Id.* at 256. ECCO § 27.2935, on the other hand, *bans* party contributions altogether.

114.    ECCO § 27.2950's prohibition on contributions from political parties to their own candidates thus impermissibly burdens the speech and associational rights of RPSD and others similarly situated to them. It is not closely drawn to a sufficiently important interest, and so cannot pass constitutional scrutiny. It is also unconstitutionally overbroad, burdening substantially more associational and speech rights than are justified by the proffered anti-corruption interest.

115.    The ban on contributions from political parties to their own candidates contained in ECCO §§ 27.2950 and 27.2951 is therefore unconstitutional, both facially and as applied to the plaintiffs.

VERIFIED COMPLAINT                          20                    *Thalheimer v. City of San Diego*

## Count 5—Ban on Soliciting and Accepting
## Organizational Contributions

116.    Plaintiffs re-allege and incorporate by reference all of the allegations contained in all of the preceding paragraphs.

117.    In addition to barring political parties from contributing to their own candidates, ECCO § 27.2950 also makes it unlawful for candidates like Mr. Thalheimer to solicit or accept contributions from organizational entities, including labor unions, sole proprietorships, partnerships, LLPs, LLCs taxed as partnerships, APCs, trusts, labor unions, and PACs.

118.    Mr. Thalheimer wants to solicit, accept and spend contributions from these types of organizational entities, and would do so, but for ECCO §§ 27.2950 and 27.2951, which make it unlawful.

119.    The Supreme Court has recognized that "the compelling governmental interest in preventing corruption support[s] the restriction of the influence of political war chests funneled through the corporate form." *FEC v. National Conservative Political Action Committee*, 470 U.S. 480, 500–01 (1985).  This is because state law grants corporations special advantages, such as "favorable treatment of the accumulation and distribution of assets" which "enhance their ability to attract capital and deploy their resources." *Austin v. Michigan Chamber of Commerce*, 494 U.S. 652, 658–59 (1990).  However, the Court has affirmed that "the mere fact that corporations may accumulate large amounts of wealth" is not sufficient justification for restricting the ability of corporations to participate in the political process; rather, the justification comes from "the unique state-conferred corporate structure that facilitates the amassing of large treasuries." *Id.* at 660.

120.    Business entities (such as sole proprietorships, partnerships, LLPs, and LLCs taxed as partnerships), political action committees, and other non-corporate entities like trusts and labor unions, simply do not possess the "unique state-conferred corporate structure" that the Supreme Court has found justifies restricting corporate contributions to candidates.

//

//

121.   The ban on soliciting and accepting contributions from organizational entities is not closely drawn to a sufficiently important interest, and so cannot pass scrutiny.  It is also overbroad.

122.   The ban on soliciting and accepting contributions from Business entities (such as sole proprietorships, partnerships, LLPs, and LLCs taxed as partnerships, and APCs), political action committees, and other non-corporate entities like trusts and labor unions, contained in ECCO §§ 27.2950 and 27.2951 is therefore unconstitutional, both facially and as applied to the plaintiffs.

## Count 6—Expenditure Limits for Independent Expenditures (Committees)

123.   Plaintiffs re-allege and incorporate by reference all of the allegations contained in all of the preceding paragraphs.

124.   ECCO § 27.2903 defines a *general purpose recipient* committee as "any [individual/organization] that receives contributions totaling $1,000 or more during a calendar year to support or oppose more than one candidate or measure," and "is not controlled by a candidate."

125.   Lincoln Club meets the definitional requirements for a general purpose recipient committee:  It solicits and receives contributions totaling at least $1,000, uses some of the money it receives to make independent expenditures to support or oppose more than one candidate or measure, and is not controlled by a candidate.

126.   ECCO § 27.2936(a) allows general purpose recipient committees like Lincoln Club to participate in City candidate elections by using contributions from individuals, "subject to the contribution limits established by this section."

127.   ECCO § 27.2936(b) makes it "unlawful" for general purpose recipient committees like Lincoln Club "to use a contribution for the purpose of supporting or opposing a candidate unless the contribution is attributable to an individual in an amount that does not exceed $500 per candidate per election."

128.   Lincoln Club wants to make independent expenditures in support of candidates in amounts greater than can be attributed "to an individual in an amount that does not exceed $500 per candidate per election," as ECCO § 27.2936(b) requires.  It would do so, but for the law.

129.     Further, Lincoln Club is even more limited in the expenditures they may make than what might at first appear to be the case. For instance, if Contributor A gives $100 to Lincoln Club, and Contributor B gives $900 to Lincoln Club, they are not allowed to spend the full amount for independent expenditures, even though $1000 divided by 2 equals $500 that *could* be attributed to each of their 2 contributors.  Rather, because Contributor A did not actually contribute $500, they cannot attribute any money to him beyond the $100 he contributed.  So, Lincoln Club would only be able to spend $600 on independent expenditures for the candidate of their choice (the $100 contribution of Contributor A, and the first $500 contributed by Contributor B).

130.     Advocacy accomplished by means of independent expenditures is political speech that is protected by the First Amendment. *Buckley*, 424 U.S. at 48.  Such speech is at the very *core* of the First Amendment. *F.E.C. v. National Conservative Political Action Committee*, 470 U.S. 480, 496 (1985) (*"NCPAC"*) ("There can be no doubt that the [independent] expenditures at issue in this case produce speech at the core of the First Amendment.").  A limit on independent expenditures therefore "heavily burdens *core* First Amendment expression." *Buckley*, 424 U.S. at 48 (emphasis added).

131.     Expenditure limits are subject to strict scrutiny; that is, they must be narrowly tailored to a compelling interest. *See, e.g., F.E.C. v. Colorado Republican Federal Campaign Committee*, 533 U.S. 431, 440 (2001) (*Col. Rep. II*); *NCPAC*, 470 U.S. at 496.  *See also Lincoln Club of Orange County v. City of Irvine, CA*, 292 F.3d 934, 937 (9th Cir. 2002).

132.     The Supreme Court has repeatedly found independent expenditure limits unconstitutional, because they cannot pass strict scrutiny. *Buckley*, 424 U.S. at 51, *NCPAC*, 470 U.S. at 501, *Colorado Republican Federal Campaign Committee v. FEC*, 518 U.S. 604, 608 & 618 (1996) (*Col. Rep. I*).

133.     The expenditure limit on committees making independent expenditures imposed by ECCO § 27.2936(a) and (b) impermissibly burdens and chills the speech rights of Lincoln Club, and cannot pass the strict scrutiny requirement. It is also unconstitutionally overbroad, burdening substantially more associational and speech rights than are justified by the proffered anti-corruption

1   interest.

2   134.   ECCO § 27.2936 is therefore unconstitutional, both facially and as applied to the

3   plaintiffs.

### Count 7—Ban on Soliciting, Accepting and Using Organizational Contributions For Independent Expenditures

6   135.   Plaintiffs re-allege and incorporate by reference all of the allegations contained in all

7   of the preceding paragraphs.

8   136.   ECCO § 27.2936(b) makes it unlawful for committees to spend contributions for

9   independent expenditures, unless the contribution is attributable to an *individual*.

10   137.   Further, ECCO § 27.2951(a) makes it unlawful for committees to accept contributions

11   "drawn against a checking account or credit card account unless such account belongs to one or more

12   individuals in their individual capacity," while ECCO § 27.2950(g) clarifies that this only applies

13   to contributions the committee uses to participate in city candidate elections, including making

14   independent expenditures in support of, or opposition to, candidates.

15   138.   Thus, Lincoln Club and ABC PAC cannot use contributions from trusts, corporations

16   and other business and organizational entities to support or oppose the candidates of their choice,

17   nor can they accept such contributions if they are to be used for independent expenditures.

18   139.   Lincoln Club still makes independent expenditures from the contributions they

19   receive from individuals.  However, they want to also use contributions received from non-

20   individuals, such as trusts, corporations and other business and organizational entities, for their

21   independent expenditures in support of, or opposition to, candidates of their choice.  They would do

22   so, but for ECCO § 27.2936(b).

23   140.   ABC PAC receives the bulk of its contributions from businesses.  Consequently, it

24   does not currently make independent expenditures in support of, or opposition to, candidates of its

25   choice. ABC PAC wants to make such expenditures, and would do so, but for ECCO § 27.2936(b)'s

26   prohibition against using money that cannot be attributed to individuals.

27   141.   Under current Supreme Court precedent, the government may limit for-prohibit

28

**VERIFIED COMPLAINT**                                   **24**                          *Thalheimer v. City of San Diego*

corporate independent expenditures. *Austin v. Michigan Chamber of Commerce*, 494 U.S. 652 (1990). But, the Supreme Court is currently considering whether to overrule *Austin* (and *McConnell*'s reliance upon it) to the extent *Austin* permitted the Government to limit for-profit corporations' and unions' expenditures.[21]

142.    If the Supreme Court overturns *Austin* so that governments may not constitutionally limit the amount of money corporations may spend for independent expenditures, then by extension ECCO §§ 27.2936(b) and 27.2951(a), which prohibit independent expenditure committees from using corporate and other business-entity funds to make independent expenditures, should likewise be held unconstitutional.

143.    Even if the Supreme Court does not overrule *Austin*, ECCO §§ 27.2936(b) and 27.2951(a) still are not closely drawn to a sufficiently important interest, but are overinclusive in that they burden more speech and associational rights than can be justified by the City's interest.

144.    ECCO §§ 27.2936(b) and 27.2951(a) are also overbroad—that is, they burden substantially more associational and speech rights than are justified by any compelling interest. *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973).

145.    The Supreme Court has recognized that "the compelling governmental interest in preventing corruption support[s] the restriction of the influence of political war chests funneled through the corporate form." *FEC v. National Conservative Political Action Committee*, 470 U.S. 480, 500–01 (1985). This is because state law grants corporations special advantages, such as "favorable treatment of the accumulation and distribution of assets" which "enhance their ability to

---

[21]*See* Order 08-205, *Citizens United v. Federal Election Commission* (June 29, 2009), *available at* http://www.supremecourtus.gov/orders/courtorders/062909zr.pdf (last visited December 8, 2009). The Order reads in pertinent part as follows:

> This case is restored to the calendar for reargument. The parties are directed to file supplemental briefs addressing the following question: For the proper disposition of this case, should the Court overrule either or both *Austin v. Michigan Chamber of Commerce*, 494 U.S. 652 (1990), and the part of *McConnell v. Federal Election Comm'n*, 540 U.S. 93 (2003), which addresses the facial validity of Section 203 of the Bipartisan Campaign Reform Act of 2002, 2 U.S.C. §441b?

attract capital and deploy their resources." *Austin v. Michigan Chamber of Commerce*, 494 U.S. 652, 658–59 (1990). However, the Court has affirmed that "the mere fact that corporations may accumulate large amounts of wealth" is not sufficient justification for restricting the ability of corporations to participate in the political process; rather, the justification comes from "the unique state-conferred corporate structure that facilitates the amassing of large treasuries." *Id.* at 660.

146. Trusts, sole proprietorships, partnerships, limited liability partnerships, limited liability corporations taxed as partnerships, and APCs do not possess the "unique state-conferred corporate structure" that the Supreme Court has found justifies restricting corporate contributions to candidates.

147. The complete ban on using contributions from non-human and business-entities in order to make independent expenditures thus impermissibly burdens and chills the speech rights of Lincoln Club and ABC PAC and cannot pass the applicable scrutiny. They are also overbroad. ECCO §§ 27.2936(b) and 27.2951(a) should therefore be held unconstitutional, both facially and as applied to the plaintiffs.

## Prayer for Relief

WHEREFORE, the Plaintiffs respectfully ask this Court for the following relief:

**1.** Declare that ECCO § 27.2938—which the Commission construes and enforces as a ban on candidates using their own money in furtherance of their campaigns more than a year in advance of the primary election—is unconstitutional, both facially and as applied to the plaintiffs, and enjoin its enforcement. In the alternative, if the Court finds that ECCO § 27.2938 does not actually prohibit candidates from using their own money in furtherance of their campaigns more than a year in advance of the primary election, declare the Commission's enforcement position unconstitutional, both facially and as applied to the plaintiffs, and enjoin them from implementing it against candidates using their own money.

**2.** Declare that ECCO 27.2938—which prohibits candidates from soliciting, accepting, and spending contributions, and donors from contributing, more than a year before the primary—is unconstitutional, both facially and as applied to the plaintiffs, and enjoin its enforcement.

3. Declare that ECCO § 27.2935—which imposes a $500 limit on the amount one may contribute to a candidate, and also imposes a $500 total amount that one may use to support a candidate (including earmarked contributions to independent expenditure committees)—is unconstitutional, both facially and as applied to the plaintiffs, and enjoin its enforcement.

4. Declare that ECCO §§ 27.2950's and 27.2951's ban on political parties making contributions to their candidates is unconstitutional, both facially and as applied to the plaintiffs, and enjoin its enforcement.

5. Declare that ECCO § 27.2950's ban on soliciting and accepting contributions from organizational contributors, and ECCO § 27.2951's ban on accepting contributions that are not drawn from an account belonging to an individual, unconstitutional, is unconstitutional, both facially and as applied to the plaintiffs, and enjoin their enforcement.

6. Declare that ECCO § 27.2936(b), which imposes limits on independent expenditures, is unconstitutional, both facially and as applied to the plaintiffs, and enjoin its enforcement.

7. Declare that ECCO § 27.2936(b), which requires that all money used to make independent expenditures be attributable to *individuals*, is unconstitutional, both facially and as applied to the plaintiffs, and enjoin its enforcement.

8. Grant costs and attorneys fees pursuant to any applicable statute or authority and especially 42 U.S.C. § 1988; and

9. Any other relief this Court in its discretion deems just and appropriate.

# Verification

I, Phil Thalheimer, declare as follows:

      1.     I am over 18 years of age.

      2.     If called upon to testify, I would competently testify as to the matters concerning me stated herein.

      3.     I verify under penalty of perjury under the laws of the United States of America that the factual statements in this Verified Complaint concerning me and my past and intended activities are true and correct to the best of my knowledge and understanding.

Executed on December 16 , 2009.

Phil Thalheimer
3924 Arroyo Sorrento Rd
San Diego, CA 92130

VERIFIED COMPLAINT          **32**          *Thalheimer v. City of San Diego*

# Verification

I, William Baber, declare as follows:

      1.     I am an attorney, and am over eighteen years of age.

      2.     I am the Director of Government Affairs for ABC PAC.

      3.     I have personal knowledge of ABC PAC and its activities, including those set out in the foregoing Verified Complaint, and if called upon to testify I would competently testify as to the matters stated herein.

      4.     I verify under penalty of perjury under the laws of the United States of America that the factual statements in this Verified Complaint concerning ABC PAC and its past and intended activities are true and correct to the best of my knowledge and understanding.

Executed on December __*17*__, 2009.

William Baber,
Director of Government Affairs
*Associated Builders & Contractors PAC*
*sponsored by Associated Builders &*
*Contractors, Inc. San Diego Chapter*
13825 Kirkham Way
Poway CA 92064

# Verification

I, T. J. Zane, declare as follows:

    1.      I am over 18 years of age.

    2.      I am the Executive Director of the Lincoln Club of San Diego County.

    3.      I have personal knowledge of the Lincoln Club of San Diego County and its activities, including those set out in the foregoing Verified Complaint, and if called upon to testify I would competently testify as to the matters stated herein.

    4.      I verify under penalty of perjury under the laws of the United States of America that the factual statements in this Verified Complaint concerning the Lincoln Club of San Diego County and its past and intended activities are true and correct to the best of my knowledge and understanding.

Executed on December 17, 2009.

 

T. J. Zane,
Executive Director
*The Lincoln Club of San Diego County*
~~1320 Columbia St.~~
~~San Diego, CA  92101~~

P.O. Box 12664
La Jolla, CA  92039

# Verification

I, C. April Boling, declare as follows:

    1.    I am over 18 years of age.

    2.    I am the Treasurer of the Republican Party of San Diego County.

    3.    I have personal knowledge of the Republican Party of San Diego County and its activities, including those set out in the foregoing Verified Complaint, and if called upon to testify I would competently testify as to the matters stated herein.

    4.    I verify under penalty of perjury under the laws of the United States of America that the factual statements in this Verified Complaint concerning the Republican Party of San Diego County and its past and intended activities are true and correct to the best of my knowledge and understanding.

Executed on December /7, 2009.


C. April Boling,
Treasurer
*Republican Party of San Diego County*
5703 Oberlin Drive, Suite 107
San Diego, CA 92121

# Verification

I, John Nienstedt, Sr., declare as follows:

     1.      I am over 18 years of age.

     2.      If called upon to testify, I would competently testify as to the matters concerning me stated herein.

     3.      I verify under penalty of perjury under the laws of the United States of America that the factual statements in this Verified Complaint concerning me and my past and intended activities are true and correct to the best of my knowledge and understanding.

Executed on December 17 , 2009.

John Nienstedt, Sr.
2170 4th Avenue
San Diego, CA 92101

Dec 18, 2009

Respectfully Submitted,

/s/ Gary D. Leasure

Gary D. Leasure (Cal. State Bar No. 211160)
Law Office of Gary D. Leasure, APC
12625 High Bluff Drive, Suite 103
San Diego, California 92130
Telephone: (858) 720-1992, Ext. 202
Facsimile: (858) 720-1990
*Local Counsel for Plaintiffs*

Jim Bopp, Jr. (Ind. State Bar No. 2838-84)*
Joe La Rue (Ohio State Bar No. 80643)*
BOPP, COLESON & BOSTROM
1 South 6th Street
Terre Haute, Indiana 47807
Telephone: (812) 232-2434
Facsimile: (812) 235-3685
*Lead Counsel for Plaintiffs*

*Pro hac vice application to be filed when docket number is available.*

**Exhibits**
**Table of Contents**

1.    Gene Cubbison, *Voters to Decide on City Council Addition* . . . . . . . . . . . . . . . . . . Tab 1

2.    Smart Voter Summary, *Proposition B—Permanency Of The Strong
      Mayor Form Of Governance, City of San Diego* . . . . . . . . . . . . . . . . . . . . . . . . . Tab 2

3.    San Diego Ethics Commission Informal Advice Letter No. IA06-11
      (December 5, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Tab 3

4.    San Diego Ethics Commission Informal Advice Letter No. IA03-05
      (June 17, 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Tab 4

5.    City of San Diego Ethics Commission, Minutes for Meeting of Thursday,
      May 8, 2008 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Tab 5

Exhibit 1





Powered by **Clickability**



SAVE THIS | EMAIL THIS | Close

# Voters to Decide on City Council Addition

## Added council member could strengthen 'strong mayor'

By **GENE CUBBISON**

Updated 6:16 PM PST, Wed, Oct 14, 2009



Does San Diego need another City Council member? That question will face voters in next June's primary election.

If they answer "yes," taxpayers will be on the hook for nearly $1 million a year to bankroll the new council office, which would be the city's ninth, following redistricting in the wake of the 2010 census.

With the city facing a budget deficit upward of $180 million next fiscal year, there would be more costs.

"You're going to be adding an additional election," noted Councilwoman Donna Frye. "It's going to cost more money forever. Forever."

Voters to Decide on City Council Addition



**WATCH**

Voters to Decide on City Council Addition

Council members are already conducting research and holding discussions, facing a March 1 deadline to refine the wording and work out a variety of administrative and political issues.

The measure would make permanent the so-called "strong mayor," chief-executive system of city government that city voters approved as a five-year experiment in 2005.

Upon creation of a ninth council district, it would require a supermajority of six council votes -- versus the current five -- to override a mayoral veto or to reverse the mayor's hiring and firing decisions on police and fire chiefs.

Since the "strong mayor" system began, the council has split four to four on a number of votes and has occasionally frustrated Mayor Jerry Sanders with a five-vote veto override.

A six-vote override requirement would raise the bar for the council to countermand future mayors.

City officials estimate it will cost more than $200,000 to place the measure on the June ballot.

"If we were in good [economic] times," said City Heights community activist Theresa Quiroz, "I think it may be a no-brainer, but at the moment, it's not."

Testifying Wednesday before the Council's Rules, Open Government & Intergovernmental Relations Committee, Quiroz said: "There is so much that we need to discuss before we spend the city's precious and dwindling time and money -- assuming that this ballot measure will pass."

Committee members took issue with using the term "strong mayor" alone in the ballot measure's title, suggesting that it be replaced with "strong mayor/strong council form of government."

By any name, the new system still has critics.

"We need to make a decision," Bird Rock resident Crickett Bradburn told the committee. "Are we satisfied with having that much power in the hands of one person -- regardless of who they are?"

First Published: Oct 14, 2009 2:44 PM PST

**Find this article at:**
http://www.nbcsandiego.com/news/politics/Number-Nine-New-SD-Council-District-a-Ballot-Question-64301472.html

[🖨 Click to Print]                                                    SAVE THIS | EMAIL THIS | Close

☐ Check the box to include the list of links referenced in the article.

Voters to Decide on City Council Addition | N⬤ San Diego                    http://www.printthis.c⬤ability.com/pt/cpt?action=cpt&title=Voters+...

© NBC Universal, Inc. | All Rights Reserved.

**Page 3 - Exhibit 1**                    11/3/2009 11:45 AM

This is an archive of a past election.
See http://www.smartvoter.org/ca/sd/ for current information.



**League of Women Voters of California Education Fund**

San Diego County, CA                                    June 3, 2008 Election

# Proposition B
## Permanency Of The Strong Mayor Form Of Goverance
## City of San Diego
### Charter Amendment - Majority Approval Required

👍 **Pass: 148672 / 76.81% Yes** votes ...... **44887 / 23.19% No** votes

### See Also: __Index of all Propositions__

### Results as of Jul 31 1:35pm

Information shown below: Fiscal Impact | Impartial Analysis | Arguments | Full Text

*Shall the voters approve an amendment to the Charter to require the City Council to submit to voters at the June 2010 election Charter amendments making the Strong Mayor form of government permanent; adding a Council seat; and, when the ninth seat is filled, increasing the Council votes required to override a mayoral veto?*

### Fiscal Impact:

The approval of this measure would require the placement of another measure on the ballot in 2010. The cost to the City to place a measure on the ballot varies with each election, but may range from $300,000 – $1,000,000. If placed on the ballot in 2010, this measure would include a fiscal impact statement on the costs of implementing the proposals.

### Impartial Analysis from the City Attorney

Background. For 75 years the City of San Diego had a Council-Manager form of government, in which a nine-member elected City Council, including a Mayor, governed and set policy for the City, and a City Manager acted as Chief Executive Officer, running day-to-day affairs.

In November 2004, voters approved a five-year trial period to begin January 1, 2006 to test a different structure called a Strong Mayor, or Mayor-Council, form of governance. In this form of governance, the elected Mayor is no longer a member of the Council, but becomes the City's Chief Executive Officer, responsible for running City affairs.

## News and Analysis

San Diego Union Tribune

- Ballot measure campaign starts slowly - 3/28/08

This election is archived. Any links to sources outside of Smart Voter may no longer be active. No further links will be added to this page.

Links to sources outside of Smart Voter are provided for information only and do not imply endorsement.

During the operative trial period, the Council is an eight-member body and the Mayor may require the Council to reconsider most of the matters it passes (ordinances, resolutions, and changes to the budget) by using a veto. The Council may override the Mayor's veto with the same number of votes needed to pass the matter. Most matters require five votes of the eight Council members to pass, although some matters require six votes.

Article XV, section 255 of the Charter states that the five-year trial period remains in effect until December 31, 2010, at which time the Article will be repealed, returning the government to its previous Council-Manager form.

Proposal. The City Council has authorized a ballot proposition seeking voter approval to amend Article XV, section 255 of the San Diego City Charter. If adopted, this change would require the City Council to place a single measure on the ballot at the June 2010 election to have voters decide whether: 1) the Strong Mayor form of government should become permanent effective January 1, 2011; 2) to increase the number of City Council districts from eight to nine in conjunction with the next City redistricting process after the national census in 2010; and 3) to increase the number of Council votes needed to override the Mayor's veto to two-thirds of the nine-member Council, after the ninth Council seat is filled by election. At that point, six of nine votes would be required to override matters the Council passed by either five or six votes.

| Arguments For Proposition B | Arguments Against Proposition B |
|---|---|
| **GIVE VOTERS THE RIGHT TO MAKE REFORMS PERMANENT** | No argument against the proposition was filed in the office of the City Clerk. |

**GIVE VOTERS THE RIGHT TO MAKE REFORMS PERMANENT**
Proposition B keeps the promise to let voters make a permanent decision on the Strong Mayor system in 2010. With Proposition B, voters decide San Diego's future.

**CONTINUE STRONG MAYOR SYSTEM**
Voters approved a 5-year trial Strong Mayor form of government in 2004. Unless Proposition B is approved, the Strong Mayor reforms voters adopted will expire automatically - reinstating the City Manager system that led to San Diego's financial crisis.

Our elected Mayor - not appointed staff - is directly accountable to voters and taxpayers for city employee performance.

Under this system, the Mayor and Councilmembers reduced city deficits, increased accountability, and provided checks and balances so past mistakes can't be repeated. But the Strong Mayor system automatically expires unless voters get an opportunity to make it permanent. Proposition B gives you the right to decide.

**ADD ONE NEW COUNCIL MEMBER**
Today there are eight council districts. This can result in tie votes, causing logjams and delays for reforms and other critical matters.

Proposition B lets voters decide in 2010 if we should add a ninth district to break the logjams at City Hall and gives neighborhoods a stronger voice in decisions.

**REASONABLE MAYORAL VETO ON COUNCIL POWER**
When the Mayor disagrees with the Council, he can veto their decision. Currently, the Charter requires the same five Council votes to override a veto as were initially required to approve the same City Council action.

Proposition B will require a 2/3 council vote to override a Mayoral veto when the Council grows to nine members. That is the same requirement as in the U.S. Congress, State Legislatures, and many cities.

Please vote "Yes on B" to let the voters decide on our future form of government.

| | |
|---|---|
| LORENA GONZALEZ Secretary-Treasurer, San Diego-Imperial Counties Labor Council | COUNCILMEMBER JIM MADAFFER President, League of California Cities |
| DUANE J. ROTH Member, Charter Review Committee | LEN W. SPARROW Professor Emeritus, School of Public Affairs, SDSU |

Proposition B: Permanency Of The Strong Mayor Form Of Goverance ...          http://www.smartvoter.org/2008/06/03/ca/sd/prop/B/

ADRIAN S. KWIATKOWSKI
President, Strong Mayor-Council Institute

## Full Text of Proposition B
## PROPOSED CHARTER AMENDMENT

The portions of the charter to be added are underlined.

**Section 255: Operative Date; Sunset of Article; Future Action by Voters**

(a) The date for the provisions of this Article to become operative is January 1, 2006.

(b) After January 1, 2006, the provisions of this Article shall remain in effect for a period of five years (until December 31, 2010) at which time this Article shall be automatically repealed and removed from the Charter. However, the Council and the people reserve the right to propose amendments to the Charter at the November 2010 election or sooner to extend, make permanent, shorten or repeal the effective period of this Article and to consider increasing the number of Council districts to nine at the time of the next City Council district reapportionment which follows the national decennial census in 2010.

(c) To ensure the people have an opportunity to consider the permanency of this Article before it is automatically repealed, at the June 2010 election, the City Council shall place a measure on the ballot to propose amendments to the Charter to make this Article permanent on January 1, 2011; increase the number of Council districts to nine at the time of the next City Council district reapportionment which follows the national decennial census in 2010; and increase the number of Council votes required to override a mayoral veto of an ordinance or resolution to a two-thirds majority of the Council, with such increase to take effect at such time a ninth Council member is elected and qualified.

---

Created: July 31, 2008 13:36 PDT
Smart Voter <http://www.smartvoter.org/>
Copyright © League of Women Voters of California Education Fund   http://www.lwvc.org
The League of Women Voters neither supports nor opposes candidates for public office or political parties.

Exhibit 3

December 5, 2006

SDEC Informal Advice Letter No. IA06-11

John Kern
The Kern Company
3814 Radcliffe Lane
San Diego, CA  92122

Re:    Request for Advice Concerning Soliciting and Accepting Contributions
Prior to the One Year Period Before a Primary Election

Dear Mr. Kern:

This advice letter has been prepared in response to your e-mail to the San Diego Ethics Commission dated November 20, 2006.  You are a campaign consultant seeking advice from the Ethics Commission concerning the provisions in the City's Election Campaign Control Ordinance [ECCO] regarding time limitations applicable to the solicitation and acceptance of contributions. Because your letter seeks general advice and does not identify a specific candidate, we consider your e-mail to be a request for informal advice.

## QUESTIONS

1.  When does a person become a candidate in order to be subject to the provisions in the City's Election Campaign Control Ordinance [ECCO]?

2.  For the City election scheduled to be held June 3, 2008, do ECCO's prohibitions against soliciting and accepting contributions more than one year before an election mean that soliciting and receiving contributions directly in support or opposition to a candidate can begin on June 3, 2007?

3.  Assuming that the date in Question 2 is correct, may an individual spend his or her personal funds supporting his or her candidacy prior to June 3, 2007?

4.  Assuming the date in Question 2 is correct, may an individual spend his or her personal funds on exploratory activities such as polling and seeking professional advice regarding a possible candidacy prior to June 3, 2007?

5.  Assuming the date in Question 2 is correct, may  an individual spend his or her personal funds on literature that does not mention a specific election date or expressly advocate for his or her election (e.g., "On June 3, Vote for Candidate X") prior to June 3,  2007?

John Kern
December 5, 2006
Page 2

6. Assuming the date in Question 2 is correct, may friends of a potential candidate spend their personal funds on meetings or gatherings in their homes to introduce the potential candidate prior to June 3, 2007?

## SHORT ANSWERS

1. For purposes of the questions posed above, a person becomes a candidate subject to the provisions in the ECCO when he or she has received a "contribution" or made an "expenditure" with the intent to bring about his or her nomination or election to a City office.

2. Yes. Candidates who are seeking a City office that is the subject of the June 3, 2008, primary election may begin soliciting and accepting contributions on June 3, 2007.

3. An individual may not spend personal funds in support of his or her candidacy prior to June 3, 2007, unless such spending is solely related to "exploratory" activities. Such activities involve gathering information that an individual may use to decide whether or not to run for office. Activities designed to promote an individual's qualifications or otherwise advocate that individual's bid for elective office are not considered "exploratory."

4. An individual may spend personal funds on polling and seeking professional advice regarding a possible candidacy prior to June 3, 2007, but only to the extent that such activities are truly considered "exploratory."

5. An individual may not spend personal funds prior to June 3, 2007, on literature if that literature expressly or impliedly advocates for his or her election. For example, a person's list of qualifications or achievements need not mention a particular elective office or election date in order to imply that the person is qualified for office.

6. Friends of a potential candidate may spend their personal funds prior to June 3, 2007, on meetings or gatherings in their homes to introduce a potential candidate if the total cost of each event is $500 or less and paid for by the home's occupants.

## ANALYSIS AND DISCUSSION

Please note that many of the terms in ECCO, including "contribution" are based on, and intended to be consistent with, provisions of the state's Political Reform Act [PRA]. SDMC § 27.2903. Accordingly, the Ethics Commission often relies on opinions and advice letters issued by the California Fair Political Practices Commission [FPPC] that interpret the PRA and its applicable regulations. Therefore, although the conclusions reached in this advice letter are based on the law contained within ECCO, you will see below that we also look to FPPC advice letters for guidance in interpreting some of these laws.

### A. Definition of Candidate

The term "candidate" is defined in ECCO as follows:

Candidate means any individual who:

John Kern
December 5, 2006
Page 3

(a)  is listed on the ballot for elective City office; or

(b)  has begun to circulate nominating petitions or authorized others to do so on his or her behalf for nomination for or election to a City office; or

(c)  has received a contribution or made an expenditure or authorized another person to receive a contribution or make an expenditure with the intent to bring about his or her nomination for or election to any City office; or

(d)  is a City officeholder who becomes the subject of a recall election. A City officeholder "becomes the subject of a recall election" on the earlier of:

(1)  the date a notice of intention to circulate a recall petition is published pursuant to the recall provisions of this article; or,

(2)  the date a statement of organization for a committee to recall the officeholder is filed with the City Clerk or the Secretary of State pursuant to state and local law.

SDMC § 27.2903.

Because your questions concern various scenarios involving collecting and spending money for a City election campaign, subsection (c) contains the language most applicable to you. Thus, under ECCO, an individual generally becomes a "candidate" once he or she collects or spends money in furtherance of running for a City elective office. This provision is applicable regardless of whether the individual collects or spends the money personally, or does so indirectly through his or her controlled committee. In addition, whether or not an individual has announced his or her candidacy is not significant in determining whether a payment constitutes a contribution or expenditure. *In re Rosenthal*, FPPC Adv. Ltr. A-97-063b. As discussed later in this letter, however, there are some specific circumstances (e.g., "exploratory" activities) under which candidacy-related payments may be made without being considered a contribution or expenditure.

*B. Time Limits on Accepting Contributions*

Under the provisions of ECCO, candidates and their controlled committees are subject to time limitations on when they may collect contributions. In particular, section 27.2938(a) states:

It is unlawful for any candidate or controlled committee seeking elective City office to solicit or accept contributions prior to the twelve months preceding the primary election for the office sought.

As you have indicated, there is a City primary election scheduled for June 3, 2008. In accordance with section 27.2938(a), any person who is seeking office at the June 3, 2008, election may not solicit or accept any contributions until June 3, 2007. Contributions include monies paid to a candidate by his or her supporters, as well as the candidate's own money used to support his or her candidacy. SDMC § 27.2903; FPPC Regulation 18215(b)(2). Accordingly, a person intending to run for City office at the June 3, 2008, election may not accept any money from anyone else for that purpose until June 3, 2007, and also may not use his or her own money for such purposes until June 3, 2007. On June 3, 2007, however, a candidate may begin to accept contributions from individual supporters up to the amount of the applicable contribution limits (SDMC § 27.2935(a)), and may also begin to accept unlimited contributions from his or her own personal funds (SDMC § 27.2935(b)).

John Kern
December 5, 2006
Page 4

*C. Exploratory Activities*

As stated above, a person becomes a "candidate" when he or she receives a contribution (even from oneself) or makes an expenditure in connection with seeking elective City office. Your questions raise the issue of when a payment for goods or services becomes an "expenditure." The FPPC has advised that payments for strictly "exploratory" activities are not expenditures.[1] Such activities include conducting polls and surveys (1) to determine the issues that are important to voters; (2) designed to determine the degree of name recognition an individual may have and (3) designed to determine the percentages of voters who might vote for a particular individual. *In re Powell*, FPPC Advice Letter A-85-241. On the other hand, if a poll or survey lists the person's qualifications, implies that the person is qualified for a particular office, or lists the names of individuals who support or would vote for the person, then the payments for that poll or survey are considered "expenditures." *Id.*

In essence, exploratory activities are a way for a prospective candidate to gather information upon which to base a decision regarding whether or not to run for office. Such activities are not for the purpose of giving information about a prospective candidate to prospective voters. Thus, with regard to whether "seeking professional advice" constitutes an exploratory activity, the answer depends on the nature of the advice being sought. If the advice pertains solely to whether or not a person should run for office, then the exploratory exception would apply. On the other hand, if the advice sought concerns the development of campaign strategies, then a payment for that advice would constitute an expenditure outside the scope of exploratory activities.

One of your questions concerns payment for literature that does not mention a specific election date or expressly advocate for a person's election to office. Just because a piece of literature does not contain these items does not mean that it qualifies for the "exploratory" exception. Literature that indirectly or impliedly advocates a person's election to office falls outside the scope of an exploratory activity. For example, although a mailer that lists a person's qualifications for holding office may not mention an election date or contain express advocacy language, that mailer would nevertheless be considered a form of advocacy and would therefore fall outside the scope of the exploratory activities exception.

As set forth above, a person seeking to run for City office at the June 3, 2008, primary election may spend personal funds on exploratory activities prior to June 3, 2007. Outside this narrow exception, however, a person may not use personal funds prior to June 3, 2007, to pay for goods or services in connection with seeking that elective City office.[2]

*D. Payments by Friends*

You have also asked whether friends of a potential candidate may spend their personal funds prior to June 3, 2007, on meetings or gatherings in their homes to introduce a potential candidate. Generally,

---

[1] Note that if a person pays for exploratory activities and ultimately decides to become a candidate, all of the payments that person made in connection with the exploratory activities must be disclosed in a campaign statement. *In re Powell, FPPC Advice Letter A-85-241.*

[2] All personal funds used to promote the election of a candidate must be deposited in a campaign checking account (and thus become contributions) prior to expenditure. Cal. Gov't Code § 85201(d). All campaign expenditures must be made from that account. Cal. Gov't Code § 85201(e). Note that these provisions do not apply to a candidate's filing fee, or to candidates who do not accept contributions or make expenditures exceeding $1,000 within a calendar year.

John Kern
December 5, 2006
Page 5

when meetings or gatherings are made at the behest of a potential candidate, the funds used to pay for those events are considered in-kind (or non-monetary) contributions to that candidate. As stated above, a candidate for the June 3, 2008, election may not accept contributions, including in-kind contributions, prior to June 3, 2007. There is an exception, however, for payments made by the occupant of a home or office for costs related to meetings held in the occupant's home, but only if the total cost of the meeting is $500 or less. SDMC § 27.2903; FPPC Regulation 18215(c)(3). Goods or services donated to the event by anyone other than the occupants of the home or office would be considered an in-kind contribution, and accordingly would constitute an unlawful contribution if made before June 3, 2007. For more information on the rules applicable to these types of events, please refer to our Fact Sheet on Home or Office Fundraisers for City Candidates, a copy of which is enclosed with this letter.[3]

## CONCLUSION

The provisions of ECCO do not permit a candidate or a prospective candidate to accept contributions for the City's June 3, 2008, primary election prior to June 3, 2007. This prohibition applies to contributions that a candidate may wish to give to support his or her own candidacy. A person cannot spend money to seek elective office until that money has been contributed to his or her campaign. Thus, the time limits on soliciting and accepting contributions effectively prohibit a prospective candidate from spending his or her personal funds on an election bid until one year before the primary election. There are two exceptions applicable to the questions you've raised. First, there is an exception for payments made for purely "exploratory" activities, i.e., payments to help a person decide whether or not to run for office. Second, there is an exception for meetings hosted by friends in their homes, so long as the costs are borne by the occupants and do not exceed $500.

Please note that this advice letter is being issued by the Ethics Commission solely as technical assistance from a regulatory agency as provided by SDMC section 26.0414(b). It is not to be construed as legal advice from an attorney to a client. Moreover, the advice contained in this letter is not binding on any other governmental or law enforcement agency.

If you have any additional questions, please do not hesitate to contact our office.

Sincerely,

Cristie McGuire
General Counsel


By: Stephen Ross
Program Manager-Technical Assistance

---

[3] Keep in mind that the fundraising discussed in this Fact Sheet may not occur until one year before the applicable primary election. This prohibition, however, does not prevent friends and neighbors from attending a social gathering to meet a candidate.

AS OF JANUARY 5, 2005, THIS LETTER IS SUPPLEMENTED BY

SAN DIEGO MUNICIPAL CODE SECTIONS 27.2950 & 27.2951

IN ADDITION, SOME OF THE SAN DIEGO MUNICIPAL CODE SECTIONS
REFERENCED IN THIS LETTER WERE RE-NUMBERED AS OF JANUARY 5,
2005 (SEE COMPARISON CHART WITH "OLD" AND "NEW" SECTION NUMBERS
ON THE ETHICS COMMISSION WEBSITE)

June 17, 2003

SDEC Informal Advice Letter No. IA03-05

C. April Boling, CPA

7185 Navajo Road, Suite L

San Diego, CA 92119

Re: Request for Informal Advice Regarding Acceptance of Contributions from Sole Proprietorships

Dear Ms. Boling:

This advice letter has been prepared in response to your letter to the City of San Diego Ethics Commission dated May 31, 2003. You are seeking advice from the Ethics Commission interpreting the requirements and prohibitions of the City's Election Campaign Control Ordinance [ECCO] which is contained in the San Diego Municipal Code [SDMC]. Your letter asks general, hypothetical questions, and accordingly we consider your letter to be a request for informal advice. The subject of your inquiry relates to the question of whether it is permissible to accept a campaign contribution from a sole proprietorship. Your letter includes a series of hypothetical examples. Our interpretation of ECCO on this point and the application of ECCO to your hypothetical examples are set forth in this opinion.

## ANALYSIS OF ECCO

ECCO contains the following explicit prohibition on contributions from organizations:

It is unlawful for a *candidate, committee, committee treasurer* or other *person* acting on

behalf of a *candidate* or *committee* to accept a *contribution* from any *person* other than an individual.

SDMC § 27.2947(a).  Moreover, "person" is defined in the ordinance as follows:

> "*Person*" means any individual, proprietorship, firm, partnership, joint venture, syndicate, business trust, company, corporation, association, *committee*, labor union, or any other organization or group of *persons* acting in concert.

SDMC § 27.2903.  This definition clearly expresses the legislative intent behind the ban on organizational contributions:  to prohibit the acceptance of contributions from any possible type of business structure, including a "proprietorship."  Although you are correct in pointing out that a sole proprietorship consists only of one individual, it is one individual "doing business as" a business entity. (As you know, a sole proprietorship is commonly referred to as a "DBA.")  Therefore, ECCO prohibits a committee (other than a ballot measure committee) from accepting a contribution from an individual if it is in the form of a business check from the individual's sole proprietorship.

You question whether the owner of a sole proprietorship is prohibited from participating in City elections if the owner does not have a personal checking account.  The answer is no, the contributor is not prohibited from participating.  Pursuant to Government Code section 84300 and rules adopted by the Fair Political Practices Commission, a contributor may make a contribution of less than $100 in the form of cash, a money order, or a cashier's check.  In addition, the contributor may open up a personal checking account and make a contribution from that account.  ECCO does not restrict the right of an individual to make a contribution; however, it would contradict the legislative intent of ECCO to permit a sole proprietorship to make a political contribution as a business expense.

## APPLICATION OF ECCO TO HYPOTHETICALS

In your letter, you mention several hypothetical contributors and ask whether contributions from each would be banned by ECCO.  In light of the analysis set forth above, a committee would be prohibited from accepting contributions from all of the following hypothetical contributors:

John Jones & Associates

Jones & Associates

John Jones DBA San Carlos Diner

John Jones Diner

San Carlos Diner

John Jones, San Carlos Diner

Each of the foregoing names on a contribution check would clearly indicate that the contributor is a business entity, and that therefore the acceptance of such a contribution is impermissible.  The same is not true, however, with a check from "John Jones."  In this instance, there would be no indication to the recipient that the contributor is a business entity.  ECCO does not require a committee or committee treasurer to independently verify that a contribution check drawn on an account in the name of an individual is truly from an individual, and is not actually a business checking account for a sole

proprietorship (or other type of business entity).  However, if there is some indication on the check (i.e., a tax identification number) suggesting that it is drawn against a business account, it would be incumbent on the committee or committee treasurer to ensure that the contribution is from an individual.

I hope this letter sufficiently answers your questions.  If you require additional assistance, please contact our office.

Sincerely,


Charles B. Walker

Executive Director

Exhibit 5



THE CITY OF SAN DIEGO
# ETHICS COMMISSION

---

**Minutes for Meeting of
Thursday, May 8, 2008**

---

**Item-1:     Call to Order**

Chairman Cabrera called the meeting to order at 5:00 p.m.

**Item-2:     Roll Call**

Present – Chairman Guillermo Cabrera, Vice-Chair Lee Biddle, Commissioners
Clyde Fuller,  Dorothy Leonard, Richard Valdez and Larry Westfall

Staff – Executive Director Stacey Fulhorst, General Counsel Alison Adema, Program
Manager Steve Ross,  Senior Investigator Lauri Davis,  and Executive Secretary
Katherine Hunt

Excused –  Commissioner  Krishna Haney

**Item-3:    Approval of Commission Minutes**

**Approval of Ethics Commission Minutes of April 10, 2008**

Motion:  Approve
Moved/Seconded:  Leonard/Valdez
Vote:  Carried Unanimously
Abstained: Fuller
Excused: Haney

**Item-4:    Non-Agenda Public Comment**

Simon Mayeski commented regarding the status of the formation of a public
campaign financing ad hoc subcommittee and asked whether it would be meeting
this month.

Chairman Cabrera responded that the members were appointed to an ad hoc subcommittee at the last Commission meeting.

Director Fulhorst added that the ad hoc subcommittee meetings are not open to the public.  She explained that the ad hoc subcommittee's report to the Commission will be docketed for a regular commission meeting that is open to the public.

**Item-5:     Commissioner Comment**

Commissioner Westfall commented that it has been his experience that government of all types, given free reign, will seek to grow and obtain more and more power over the lives of the public.  In the four plus years that he has served on this Commission this has been the case mostly due to the fact that the Commission had just been established and needed to do so in order to fulfill its mandate under the Municipal Code.

He expressed concern that the Commission may be extending its influence to such an extent that the Commission risks becoming part of the problem, and he expressed his view that the Commission is in danger of becoming relevant to those who seek office only as a cost of doing business.  He pointed out that there are not enough qualified campaign treasurers to meet the needs of all those wishing to run for office.  He expressed doubts as to the ability of even the best treasurers to comply with the Commission's rules.  He mentioned that fines are levied after the completion of a campaign, and he suggested that it would be very prudent to factor in an estimated Ethics Commission fine as a normal expense.

He has also noted while serving on other volunteer boards that the public does not participate very well in the process.  He pointed out that the Commission rarely has more than a few observers and commentators attending meetings.  He noted that Common Cause and Mel Shapiro attend almost all of the Commission's meetings, but expressed his view that neither represents a significant portion of the voters in San Diego.

As the Commission goes forward with the ongoing review of the Election Campaign Control Ordinance (ECCO), he would like to recommend to the Chair that some Commission time and discussion be devoted to the practical impact of the Commission's rules and procedures on candidates for office and whether the rules actually impede non-incumbents from running for office.  He would like to know why more people are not willing to serve as campaign treasurers.  Finally, he added that the Commission needs to find ways to get more public input in the mix of the Commission's various discussions.

Chairman Cabrera indicated that he would communicate with staff regarding Commissioner Westfall's concerns.

**Item-6:    Executive Director Comment**

Director Fulhorst reported that she is scheduled to teach a course for the University of California San Diego extension program this summer that is designed for people interested in various campaign professions, particularly campaign treasurers.

Director Fulhorst noted that the new Commission Auditor was in attendance. Senior Investigator Laurie Davis introduced Rosie Gomez and commented on her previous experience.

**Item-7:    General Counsel Comment**

None

**Item-8:    Proposed Amendments to Election Campaign Control Ordinance (ECCO) and Lobbying Ordinance**

Chairman Cabrera advised that during the course of the meeting, the Commission would need to finalize its recommendations for the proposed changes in order to comply with the recommended timeline for approval of the proposed amendments.

Director Fulhorst reported that the Rules Committee has docketed the matter of proposed changes to ECCO for the June 11, 2008, meeting. She noted that several new additions have been added to the draft changes since the Commission reviewed proposed housekeeping amendments at the last meeting, including adding the recommended contribution limit of $750. She reported that another change was made in response to "push polls" that have occurred during the current election cycle. Because these calls are arguably not made for the purpose of expressly supporting or opposing a City candidate, the current disclosure rules don't apply to them. Accordingly, the staff has proposed new language that would clarify that all candidates and committees that make 500 or more calls must include an identification disclosure. She added that other proposed changes regarding telephone communications are intended to bring the Commission's laws into conformance with state law.

Commissioner Valdez asked when, during the course of a call, the disclosure information should be provided.

Director Fulhorst responded that the existing laws do not specify a specific point in the conversation when disclosure must occur. Instead, the law only requires that disclosure occur at some point during the phone call.

Director Fulhorst reviewed new changes for the following code sections:

- Section 27.2903 – New definition for mass telephone communications
- Sections 27.2935 and 27.2936 – New recommended contribution limits
- Section 27.2937 – Change to reflect new indexing date of 2011

-3-

- Section 27.2971 – Changes to telephone communications
- Lobbying Ordinance Section 27.4002 – Increased fundraising activity threshold

Chairman Cabrera suggested that the Commission address any remaining changes that had not yet been discussed.  He indicated that the issue of increasing contribution limits would be moved to the end of the discussion to allow sufficient time to address the matter.  He commented that although the Commissioners had tentatively suggested a contribution limit of $750, they needed to arrive at a final recommendation to forward to the Rules Committee.

The Commission addressed the following proposed changes:

- Mass Telephone Communications

Motion: Approve proposed changes
Moved/Seconded: Valdez/Leonard
Vote: Carried unanimously
Excused: Haney

- Elimination of Member Communication Exemption

Director Fulhorst explained that the City's current law exempts member communications for non-political parties from disclosure requirements for telephone communications.  She advised that the proposed change will bring the City's law into conformance with state law that currently does not exempt member communications.

Motion: Approve proposed changes
Moved/Seconded: Leonard/Biddle
Vote: Carried Unanimously
Excused: Haney

Chairman Cabrera referred to the Commission's previous discussion regarding contribution limits.  He indicated there was some discussion to increase the limit to $750.

Commissioner Westfall commented that the Commission has been discussing campaign limits since at least the Commission's November 2007 meeting.  He pointed out that the Commission doesn't know the basis for the original $250 limit, but noted that it is clearly too low now based on the increasing costs of conducting campaigns.  He expressed his view that some of the increased costs are probably related to the complex rules the Commission established and the lack of qualified campaign treasurers.

He also stated that the Commission hasn't heard from the people of the City on this issue nor from the political parties to which they voluntarily align themselves.  In

-4-

November, the Commission heard from ten people who, with the exception of Mr. Shapiro and Common Cause, recommended the limits be eliminated. In December, the Commission heard from Professor Adams that "there isn't any evidence to support the argument that contribution limits help or hinder self-financed candidates." In spite of this, the Commission is proposing a change in the limit to an amount not based on any objective information. Commissioner Westfall questioned whether it is the role of seven people in a City of one million plus to subjectively set a campaign contribution limit.

He proposed making a motion for the Ethics Commission to recommend to the Rules Committee that contribution limits be suspended for at least one election cycle in order to determine the impact, if any, on City elections. This contemplates that all candidates report daily any contributions received during the last 30 days before an election.

Commissioner Fuller supported Commissioner Westfall's suggestion to lift contribution limits as long as contributions are reported within 24 hours.

Chairman Cabrera indicated that he would not support the motion. He pointed out that there were reasons why this practice wasn't successful before the contribution limits were implemented in 1970's. One of the main reasons was that unlimited amounts of money coming from a small number of individuals funding candidates that ultimately became elected officials created an appearance of corruption. However, he indicated that he agrees that limits need to be raised to decrease the amount of time that candidates spend fundraising.

Motion: Recommend suspension of contribution limits for at least one election cycle and require 24-hour reporting in the last 30 days of an election
Moved/Seconded: Westfall/Fuller
Vote: Motion Failed 4/2 with Chairman Cabrera, Commissioners Biddle, Leonard and Valdez voting nay
Excused: Haney

Commissioner Westfall referred to previous Commission discussion regarding contribution limits and mentioned his difficulty accepting the Commission's means of determining a limit. He suggested that the solution may be to increase limits to an amount based on inflation factors.

Commissioner Westfall made a motion to recommend that contribution limits be increased to $1,200 and increased annually thereafter for the impact, if any, of inflation.

Commissioner Leonard indicated that she would second the motion if it was amended to include adjusting a contribution limit of $1,200 biennially for inflation.

Commissioner Westfall amended the motion to set a contribution limit of $1,200 and to adjust it biennially thereafter for inflation.

-5-

Commissioner Valdez commented that he still believes that a limit of $1,200 is too high. He pointed out that a limit of $1,200 would result in a greater divide between those individuals who are able to contribute a portion of the limit and those who have the means to give the full amount. However, he noted that the Commission has a responsibility to make a recommendation to forward to the City Council. He added that the amount that the Commission arrives at should represent, to the best of the Commission's ability, the various competing interests as expressed through public testimony at Commission public hearings. He indicated he believes that amount should be $750.

Commissioner Biddle expressed his agreement with Commission Valdez's remarks. He added that small limits offer less of an opportunity for the appearance of corruption.

Commissioner Fuller stated he was in support of increasing the original $250 limit to $1,200 to adjust for inflation.

Chairman Cabrera commented that he would support a $1,000 limit but not $1,200. He indicated that his goal was to keep the limit within a range that prevents a small number of people having control over candidates, yet provides candidates the ability to raise sufficient money while spending less time fundraising. He noted that there are successful campaigns that have been funded entirely from small donations.

Commissioner Westfall advised that, in response to Commission discussion, he would amend his motion to recommend a limit of $1,000 with adjustments made biannually for inflation.

Motion: Recommend a contribution limit of $1,000 to be adjusted biennially for inflation
Moved/Seconded: Westfall/Leonard
Vote: Motion carried 4/2 with Commissioners Biddle and Valdez voting nay
Excused: Haney

In response to Chairman Cabrera's suggestion, the Commissioners indicated they would support rounding the biennial adjustment amount based on the Consumer Price Index to the nearest $50.

Chairman Cabrera advised that staff has recommended updating the Lobbying Ordinance to adjust the fundraising threshold from $1,000 to $3,000 in order to correspond with a proposed threefold increase in contribution limits.

The Commission discussed the proposal to increase the limit to $4,000 to reflect the Commission's recommendation to increase ECCO contribution limits fourfold to $1,000.

Motion: Increase fundraising activity threshold to $4,000
Moved/Seconded: Leonard/Fuller
Vote: Motion Carried 5/1 with Commissioner Valdez voting nay
Excused: Haney

Motion: Forward amendments to ECCO with latest approved changes to the Rules
Committee
Moved/Seconded: Leonard/Fuller
Vote: Carried unanimously
Excused: Haney

## Item-9:    Report on Implementation of New Lobbying Laws

Director Fulhorst commented on the implementation of the new lobbying laws that
became effective January 1, 2008.  She explained that during the course of staff
providing advice regarding the new laws, they noticed that it was possible to
interpret the law to mean that lobbyists are required to disclose clients on disclosure
reports even when the lobbyist did not make any lobbying contacts on behalf of the
client.  She noted that it was clear that the intent of the Commission and the City
Council was to only require lobbyists to disclose clients if they have had at least one
lobbying contact with a high level City Official on behalf of the client.  She explained
that this matter was docketed for Commission consideration to confirm that staff is
interpreting the law within the legislative intent of the Commission.  She noted that
staff plans to report back to the Commission in the future with housekeeping
amendments that will include proposed language to clarify this section.

Chairman Cabrera commented on the Commission's intent regarding the
applicability of the new laws.  He indicated that he agrees with staff that the
Commission's original intent was for the law to only require lobbyists to disclose a
client when a contact was made on the behalf of the client.

## Item-10:    Appointment of Ad Hoc Committee to Nominate Commission Officers at
June 12, 2008, Commission Meeting

Agenda item regarding the appointment of Commissioners to serve on an ad hoc
committee to nominate Commission officers.

Chairman Cabrera indicated that Commissioners Dorothy Leonard and Larry
Westfall have agreed to serve on the nominating committee.

Motion: Appoint Commissioners Dorothy Leonard and Larry Westfall to ad hoc
committee
Moved/Seconded: Valdez/Biddle
Vote: Carried Unanimously
Excused: Haney

-7-

Commissioner Leonard suggested amending the Municipal Code to change the election of new officers from the July meeting to the June meeting each year.

Director Fulhorst indicated that staff will include this change with other housekeeping amendments for future approval.

## Item-11:   Creation of Pre-Qualified List for Petitioners at Hearings

Director Fulhorst commented on the Ethics Commission procedures regarding the process for appointing individuals to a pre-qualified list to serve as Petitioners at Probable Cause Hearings and Administrative Hearings.   She suggested that the Commission appoint the Ethics Commission's General Counsel Alison Adema to the pre-qualified list.

Motion: Appoint General Counsel Alison Adema to pre-qualified list
Moved/Seconded: Biddle/Fuller
Vote: Carried Unanimously
Excused: Haney

## Item-12:   Adjournment to Closed Session

Chairman Cabrera adjourned the meeting to Closed Session at approximately 5:50 p.m.  He stated the Commission would reconvene into Open Session following the conclusion of Closed Session in order to report any action taken during the closed session portion of the meeting.

## Reconvene to Open Session

Chairman Cabrera called the meeting back into open session at approximately 7:20 p.m.

## Reporting Results of Closed Session Meeting of May 8, 2008

Chairman Cabrera reported the results of the Closed Session Meeting of May 8, 2008

## Item 1:      Conference with Legal Counsel  (9 potential matters)

### Case No.  2008-07 - In Re: Alleged Acceptance of Gift in Excess of LImit

Motion: Initiate Investigation
Vote: Carried Unanimously
Excused: Haney

**Case No. 2008-11 – In Re: Alleged Use of City Equipment for Campaign-Related Activities**

Motion: Dismiss
Vote: Carried Unanimously
Excused: Haney

**Case No. 2008-12 – In Re: Alleged Lobbying of City Officials by Former City Official**

Motion: Recuse Commission Chair Gil Cabrera
Vote: Carried Unanimously
Abstained: Cabrera
Excused: Haney

Motion: Recuse Commissioner Dorothy Leonard
Vote: Carried Unanimously
Abstained: Leonard
Excused: Haney

Motion: Initiate Investigation
Vote: Carried Unanimously
Recused: Cabrera/Leonard
Excused: Haney

**Case No.  2008-14 – In Re: Alleged Acceptance of Gift in Excess of Limit**

Motion: Initiate Investigation
Vote: Carried Unanimously
Excused: Haney

**Case No. 2008-15 – In Re: Alleged Failure to Include "paid for by" Disclosure on Campaign Advertising**

Motion: Initiate Investigation
Vote: Carried Unanimously
Excused: Haney

**Case No. 2008-16 – In Re: Alleged Failure to Include "on behalf of" disclosure on Telephone Communication**

Motion: Initiate Investigation
Vote: Carried Unanimously
Excused: Haney

**Case No.  2008-17 – In Re: Alleged  Failure to Include "on behalf of" disclosure on Telephone Communication**

Motion: Initiate Investigation
Vote: Carried Unanimously
Excused: Haney

**Case No. 2008-20 – In Re: Alleged Failure to Properly Disclose Economic Interests**

Motion: Initiate Investigation
Vote: Carried Unanimously
Excused: Haney

**Case No. 2008-21 – In Re: Alleged Failure to Properly Disclose Economic Interests**

Motion: Initiate Investigation
Vote: Carried Unanimously
Excused: Haney

**Item 2:**       **Conference with Legal Counsel**  (7 potential matters)

One item withdrawn

**Case No. 2007-73 – In Re:  Alleged Failure to Disqualify from Municipal Decision Affecting Economic Interests**

Motion: Dismiss
Vote: Carried Unanimously
Excused: Haney

**Case No. 2007-92 – In Re: Alleged Failure to Register as a Lobbyist**

No reportable action

**Case No. 2007-93 – In Re: Mike Aguirre - Alleged Unlawful Solicitation of Campaign Contributions from City employees**

<u>Motion:</u> Ordered a Probable Cause Hearing and Authorized the issuance of a Probable Cause Report and Draft Administrative Complaint.  Hearing scheduled for July 25, at 9:00 a.m.
Vote: Carried Unanimously
Recused: Valdez
Excused: Haney

-10-

**Case No. 2008-08 – In Re: Alleged Violation of Contribution Limits and Accepting Contribution from Organization**

No Reportable Action

**Case No.  2008-09 – In Re: Alleged Failure to Properly Disclose Economic Interests**

Motion: Dismiss
Vote: Carried Unanimously
Excused: Haney

**Case No. 2008-10 – In Re: Alleged Unlawful Solicitation of Campaign Contributions from City employees**

No Reportable Action

**Adjournment**

The meeting adjourned at approximately 7:25 p.m.

_____          _____
Guillermo Cabrera, Commission Chair        Kathy Hunt, Executive Secretary
Ethics Commission                          Ethics Commission

***THIS INFORMATION WILL BE MADE AVAILABLE IN ALTERNATIVE FORMATS UPON REQUEST.***

 ORIGINAL

JS 44 (Rev. 12/07)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS
Thalheimer, Phil;  Continued on attachment

## DEFENDANTS
City of San Diego; Continued on Attachment

**(b)** County of Residence of First Listed Plaintiff   **San Diego**
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant   **San Diego**
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
See attachment

Attorneys (If Known)

**09 CV 2862 IEG WMC**

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1 U.S. Government Plaintiff
☒ 3 Federal Question (U.S. Government Not a Party)
☐ 2 U.S. Government Defendant
☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

### CONTRACT
☐ 110 Insurance
☐ 120 Marine
☐ 130 Miller Act
☐ 140 Negotiable Instrument
☐ 150 Recovery of Overpayment & Enforcement of Judgment
☐ 151 Medicare Act
☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)
☐ 153 Recovery of Overpayment of Veteran's Benefits
☐ 160 Stockholders' Suits
☐ 190 Other Contract
☐ 195 Contract Product Liability
☐ 196 Franchise

### REAL PROPERTY
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

### TORTS
**PERSONAL INJURY**
☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers' Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury

**PERSONAL INJURY**
☐ 362 Personal Injury - Med. Malpractice
☐ 365 Personal Injury - Product Liability
☐ 368 Asbestos Personal Injury Product Liability

**PERSONAL PROPERTY**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

### CIVIL RIGHTS
☐ 441 Voting
☐ 442 Employment
☐ 443 Housing/ Accommodations
☐ 444 Welfare
☐ 445 Amer. w/Disabilities - Employment
☐ 446 Amer. w/Disabilities - Other
☒ 440 Other Civil Rights

### PRISONER PETITIONS
☐ 510 Motions to Vacate Sentence
**Habeas Corpus:**
☐ 530 General
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

### FORFEITURE/PENALTY
☐ 610 Agriculture
☐ 620 Other Food & Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 R.R. & Truck
☐ 650 Airline Regs.
☐ 660 Occupational Safety/Health
☐ 690 Other

### LABOR
☐ 710 Fair Labor Standards Act
☐ 720 Labor/Mgmt. Relations
☐ 730 Labor/Mgmt.Reporting & Disclosure Act
☐ 740 Railway Labor Act
☐ 790 Other Labor Litigation
☐ 791 Empl. Ret. Inc. Security Act

### IMMIGRATION
☐ 462 Naturalization Application
☐ 463 Habeas Corpus - Alien Detainee
☐ 465 Other Immigration Actions

### BANKRUPTCY
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

### PROPERTY RIGHTS
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

### SOCIAL SECURITY
☐ 861 HIA (1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g))
☐ 864 SSID Title XVI
☐ 865 RSI (405(g))

### FEDERAL TAX SUITS
☐ 870 Taxes (U.S. Plaintiff or Defendant)
☐ 871 IRS—Third Party 26 USC 7609

### OTHER STATUTES
☐ 400 State Reapportionment
☐ 410 Antitrust
☐ 430 Banks and Banking
☐ 450 Commerce
☐ 460 Deportation
☐ 470 Racketeer Influenced and Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Sat TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 890 Other Statutory Actions
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 895 Freedom of Information Act
☐ 900 Appeal of Fee Determination Under Equal Access to Justice
☐ 950 Constitutionality of State Statutes

## V. ORIGIN (Place an "X" in One Box Only)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
First and Fourteenth Amendments, 42 USC Section 1983
Brief description of cause:
Plaintiffs challenging City of San Diego Laws that they believe infringe on First Amendment rights

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $
CHECK YES only if demanded in complaint:
JURY DEMAND:  ☐ Yes  ☒ No

## VIII. RELATED CASE(S) IF ANY
(See instructions):   JUDGE _____   DOCKET NUMBER _____

DATE  12/18/09

SIGNATURE OF ATTORNEY OF RECORD

### FOR OFFICE USE ONLY
RECEIPT #  8494   AMOUNT  350.00   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

WS  12/21/09

Attachment

1(a)   PLAINTIFFS

(Continued)
Associated Builders & Contractors PAC sponsored by Associated Builders and Contractors Inc.;
San Diego Chapter, Lincoln Club of San Diego County;
Republican Party of San Diego;
Nienstedt, John, Sr.

DEFENDANTS

(Continued)
City of San Diego Ethics Commissioners all sued in their Official Capacities
        Valdez, Richard M., Chairman
        Biddle, W. Lee, Commissioner
        Cabrera, Guillermo ("Gil"), Commissioner
        Fuller, Clyde, Commissioner
        Leonard, Dorothy, Commissioner
        Westfall, Larry S.;
Mayor of San Diego
        Sanders, Jerry, Mayor, Sued in his official capacity
San Diego City Attorney
        Goldsmith, Jan, City Attorney, Sued in his official capacity
City Clerk of San Diego
        Maland, Elizabeth, City Clerk, Sued in her official capacity


(c)        Attorneys

Law Office of Gary D. Leasure, Apc
Gary D. Leasure
12625 High Bluff Drive, Suite 103
San Diego, CA 92130
(858) 720-1992
Local Counsel for Plaintiffs

Bopp, Coleson & Bostrom
Jim Bopp Jr.
Joe La Rue
1 South 6th Street
Terre Haute, Indiana 47807
(812) 232-2434
Lead Counsel for Plaintiffs

```
Court Name: USDC California Southern
Division: 3
Receipt Number: CAS008494
Cashier ID: msweaney
Transaction Date: 12/21/2009
Payer Name: LO OF GARY D LEASURE
----------------------------------
CIVIL FILING FEE
 For: THALHEIMER V CITY OF SD
 Case/Party: D-CAS-3-09-CV-002862-001
 Amount:      $350.00
----------------------------------
CHECK
 Check/Money Order Num: 3223
 Amt Tendered:  $350.00
----------------------------------
Total Due:     $350.00
Total Tendered: $350.00
Change Amt:    $0.00


There will be a fee of $45.00
charged for any returned check.
```