1

2

3

4

5

6

7     # UNITED STATES DISTRICT COURT

8     # SOUTHERN DISTRICT OF CALIFORNIA

9

10    PHIL THALHEIMER; ASSOCIATED
      BUILDERS & CONTRACTORS PAC,
11    sponsored by Associated Builders &
      Contractors, Inc. San Diego Chapter;
12    LINCOLN CLUB OF SAN DIEGO
      COUNTY; REPUBLICAN PARTY OF SAN
13    DIEGO; and JOHN NIENSTEDT, SR.,

14                              Plaintiffs,

15           vs.

16

17    CITY OF SAN DIEGO; RICHARD M.
      VALDEZ, Chair, City of San Diego Ethics
18    Commissioner, sued in his official capacity;
      W. LEE BIDDLE, City of San Diego Ethics
19    Commissioner, sued in his official capacity;
      GUILLERMO CABRERA, City of San
20    Diego Ethics Commissioner, sued in his
      official capacity, also known as Gil; CLYDE
21    FULLER, City of San Diego Ethics
      Commissioner, sued in his official capacity;
22    DOROTHY LEONARD, City of San Diego
      Ethics Commissioner, sued in her official
23    capacity; LARRY S. WESTFALL, City of
      San Diego Ethics Commissioner, sued in his
24    official capacity; JERRY SANDERS, The
      Honorable Mayor of San Diego, sued in his
25    official capacity; JAN GOLDSMITH, City
      Attorney for the City of San Diego, sued in
26    his official capacity; and ELIZABETH
      MALAND, City Clerk of San Diego, sued in
27    her official capacity,

28                              Defendants.

CASE NO. 09-CV-2862 – IEG (BGS)

**ORDER:**

**(1) GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT. [Doc. No. 119], and**

**(2) GRANTING IN PART AND DENYING IN PART DEFENDANT CITY OF SAN DIEGO'S MOTION FOR PARTIAL SUMMARY JUDGMENT, [Doc. No. 115].**

This is an action challenging the constitutionality of San Diego's campaign finance laws on First Amendment grounds. At issue are six provisions of the San Diego Municipal Election Campaign Control Ordinance ("ECCO"), which is a comprehensive law governing all aspects of campaign financing in San Diego city elections. Currently before the Court are the parties' cross-motions for summary judgment. Having considered the parties' arguments, and for the reasons set forth below, the Court concludes that the following ECCO sections violate the First Amendment: § 27.2938(a), to the extent it prohibits candidates from spending their own money prior to twelve months before an election; § 27.2936(b), to the extent it sets a limit on how much individuals and non-individuals can contribute to general purpose recipient committees, including political parties, making independent expenditures; §§ 27.2950 and 27.2951, to the extent they completely ban direct contributions to candidates by political parties; and § 27.2934(b), which was enacted after this Court's grant of preliminary injunction and which places a $1,000 limit on direct contributions to candidates by political parties. On the other hand, the Court concludes that the following ECCO sections are closely drawn to achieve a sufficiently important interest, and therefore do not violate the First Amendment: § 27.2938(a), to the extent it prohibits contributions prior to twelve months before an election; § 27.2935(a), which places a $500 limit on individual contributions to candidates; § 27.2936(b), to the extent it places a $500 limit and an "individual" attribution on contributions to general purpose recipient committees, including political parties, when they make direct contributions to candidates; and §§ 27.2950 and 27.2951, to the extent they completely ban direct contributions to candidates by non-individuals other than political parties. Accordingly, both Plaintiffs' motion for summary judgment and Defendant City of San Diego's partial motion for summary judgment are **GRANTED IN PART and DENIED IN PART**.

## BACKGROUND

Plaintiffs are Phil Thalheimer, a former and future city council candidate; ABC PAC, a political action committee formed by the San Diego chapter of the Associated Builders and Contractors, Inc.; the Lincoln Club, a registered political action committee; the Republican Party of San Diego, the local branch of the national Party; and John Nienstedt, a San Diego resident who regularly contributes to local candidates and political committees. Plaintiffs filed this lawsuit to

1  enjoin enforcement of several provisions of the San Diego campaign finance laws they claim

2  violate their respective First Amendment rights, facially and as applied.

3      Plaintiffs' complaint named as Defendants the City of San Diego ("the City") and several

4  government officials in their official capacity.  On January 8, 2010, the Court granted the parties'

5  joint motion to dismiss all Defendants except the City.  [Doc. No. 9.]  The dismissed Defendants

6  remain bound by the Court's rulings with respect to the matters at issue.  [*Id.*]

7      Plaintiffs challenge six provisions of the ECCO, which is a comprehensive law governing

8  all aspects of campaign financing in San Diego city elections.[1]  The ECCO was added to the San

9  Diego Municipal Code in 1973, following a scandal that led to the indictment of the City's Mayor

10  and eight of the City Council members on corruption charges ("the Yellow Cab scandal").  (*See*

11  Declaration of Stacey Fulhorst in Support of Defendant's Motion for Summary Judgment

12  ("Fulhorst Decl.") ¶ 5 [Doc. No. 115-5]; Declaration of Steven P. Erie, Ph.D. in Support of

13  Defendant's Motion for Summary Judgment ("Erie Decl.") ¶ 6 [Doc. No. 115-6].)

14      In their initial verified complaint, filed on December 21, 2009, Plaintiffs challenged the

15  following provisions of the ECCO, both facially and as applied to Plaintiffs:

16  -  **Section 27.2935(a)**, which makes it "unlawful for an individual to make to any candidate or committee supporting or opposing a candidate, or for any candidate or committee supporting or opposing a candidate to solicit or accept, a contribution that would cause the total amount contributed by that individual to support or oppose the candidate to exceed $500 for any single election."

17

18

19  -  **Section 27.2936(b)**, which makes it "unlawful for any general purpose recipient committee to use a contribution for the purpose of supporting or opposing a candidate unless the contribution is attributable to an individual in an amount that does not exceed $500 per candidate per election."[2]

20

21

22  -  **Section 27.2938(a)**, which makes it "unlawful for any candidate or controlled committee seeking elective City office to solicit or accept contributions prior to the twelve months

23

24

25

26  _____

   [1] The ECCO is found in Chapter 2, Article 7, Division 29 of the San Diego Municipal Code, Section 27.2901 through Section 27.2991.  (*See* Def. RJN, Ex. 4 [Doc. No. 115-11].)

27

28  [2] A "general purpose recipient committee" is "any person that receives contributions totaling $1,000 or more during a calendar year to support or oppose more than one candidate or measure.  This type of committee is not controlled by a candidate."  ECCO § 27.2903.

preceding the primary election for the office sought."[3]  The San Diego Ethics Commission ("SDEC") has opined that this prohibition extends to a candidate spending personal funds in support of his or her own candidacy prior to the twelve months preceding the election. (*See* SDEC Informal Advice Letter No. IA06-11, at 2 (Dec. 5, 2006) (attached as Exhibit 3 to First Amended Verified Complaint [Doc. No. 94-1]).)

- **Section 27.2950**, which makes it "unlawful for a candidate or controlled committee, or any treasurer thereof, or any other person acting on behalf of any candidate or controlled committee, to solicit or accept a contribution from any person other than an individual for the purpose of supporting or opposing a candidate for elective City office."  ECCO § 27.2950(a).  It also makes it "unlawful for a person other than an individual to make a contribution to a candidate or controlled committee for the purpose of supporting or opposing a candidate for elective City office."  ECCO § 27.2950(b).  A "person" other than an individual includes a "proprietorship, firm, partnership, joint venture, syndicate, business trust, company, corporation, association, committee, labor union, or any other organization or group of persons acting in concert."  ECCO § 27.2903.

- **Section 27.2951**, which makes it "unlawful for any individual to make, or any committee to accept, a contribution drawn against a checking account or credit card account unless such account belongs to one or more individuals in their individual capacity."

As soon as they filed their verified complaint, Plaintiffs moved for a preliminary injunction to block enforcement of the challenged ECCO provisions before trial, a time period they noted would likely encompass at least two municipal elections: San Diego's June 8, 2010 primary, and the November 2, 2010 general election.  On February 16, 2010, after hearing oral argument on the motion, the Court granted in part and denied in part the preliminary injunction.  Specifically, the Court concluded that Plaintiffs were unlikely to succeed in challenging § 27.2935(a), the City's $500 individual contribution limit, except as it applied to contributions to committees making independent expenditures.  The Court also held that Plaintiffs were unlikely to succeed in their First Amendment challenge to the temporal contribution ban, § 27.2938(a), except to the extent it prohibited the candidates from spending their own money.  On the other hand, the Court preliminarily enjoined enforcement of § 27.2936(b), which set fund-raising/spending limits as to committees making only independent expenditures.  Finally, as to the non-individual contribution limits, §§ 27.2950 and 27.2951, the Court concluded that Plaintiffs were unlikely to succeed on their claim that the laws were unconstitutional as applied to corporations and other organizational entities, but enjoined the provisions as applied to political parties.  [Doc. No. 42.]

---

[3] The ECCO defines a "controlled committee" as "any committee controlled directly or indirectly by a candidate or that acts jointly with a candidate or controlled committee in connection with the making of expenditures."  ECCO § 27.2903.

On February 19, 2010, in response to the parties' motions for clarification, the Court clarified that the injunction with respect to § 27.2936(b) enjoined the City from enforcing that provision as to both *individual* and *non-individual* contributions.  [Doc. No. 46.]  The Court also clarified that the City was enjoined from enforcing § 27.2951 to the extent that section prohibited committees that *make only independent expenditures* from accepting contributions drawn against a checking or credit card account belonging to a *non-individual*.  [*Id.*]

Following the Court's order on the preliminary injunction, the City enacted **§ 27.2934(b)**, allowing political parties to contribute up to $1,000 per election to candidates in municipal elections.[4]  In their First Amended Verified Complaint ("FAVC"), filed on August 12, 2010, Plaintiffs challenged the new provision and then sought preliminary injunction against its enforcement pending trial.  On September 3, 2010, the Court denied the preliminary injunction in this respect.  [Doc. No. 104.]  The Court also denied Plaintiffs' request to enjoin § 27.2936(b) to the extent the City intended to apply it to political party committees making contributions to City candidates.  The Court did so based on the City's representations that it will not enforce § 27.2936(b) "with regard to political party committees making contributions to City candidates for so long as the $1,000 limit on such contributions remains in effect."  (*See* Declaration of Stacey Fulhorst in Support of Defendant's Response to Supplemental Authority ¶ 4 [Doc. No. 103-1].)

The parties cross-appealed the Court's order on the preliminary injunction, except as to the Court's decision not to enjoin the $500 contribution limit in § 27.2935(a) and the Court's decision to enjoin § 27.2938(a) as it applied to the candidates spending their own funds.  Plaintiffs also did not appeal the Court's decision denying an injunction with respect to § 27.2934(b).  On June 9, 2011, the Ninth Circuit affirmed this Court's initial preliminary injunction order in all respects. *See Thalheimer v. City of San Diego*, 645 F.3d 1109 (9th Cir. 2011).

The parties filed their cross-motions for summary judgment on November 23, 2011, together with their respective statements of undisputed facts.  The parties filed their oppositions on

---

[4] ECCO § 27.2934(b) makes it "unlawful for a political party committee to make, or for a candidate or controlled committee to solicit or accept, a contribution that would cause the total amount contributed by the political party committee to the candidate and the candidate's controlled committee to exceed $1,000 for any single City candidate election."

1  December 9, 2011, and their replies on December 16, 2011.  On December 28 and 29, 2011, the

2  City filed two notices of supplemental authority, bringing to this Court's attention two recently

3  decided cases: *Ognibene v. Parkes*, — F.3d —, 2011 WL 6382451 (2d Cir. Dec. 21, 2011),

4  *amended and superseded by* — F.3d —, 2012 WL 89358 (Jan. 12, 2012), and *Family PAC v.*

5  *McKenna*, — F.3d —, 2011 WL 6826338 (9th Cir. Dec. 29, 2011).  Plaintiffs filed a response to

6  the City's first notice of supplemental authority on January 3, 2012.  The Court heard oral

7  argument on the parties' cross-motions for summary judgment on January 6, 2012.

8  **LEGAL STANDARD**

9  　　Summary judgment is proper where the pleadings and materials demonstrate "there is no

10  genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

11  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

12  　　The moving party bears "the initial responsibility of informing the district court of the basis

13  for its motion." *Celotex*, 477 U.S. at 323.  To satisfy this burden, the movant must demonstrate

14  that no genuine issue of material fact exists for trial.  *Id.* at 322.  To withstand a motion for

15  summary judgment, the non-movant must then show that there are genuine factual issues which

16  can only be resolved by the trier of fact.  *Reese v. Jefferson Sch. Dist. No. 14J*, 208 F.3d 736, 738

17  (9th Cir. 2000).  A party asserting that a fact cannot be or is genuinely disputed cannot rely solely

18  on its pleadings, but must support that assertion with affidavits, depositions, or answers to

19  interrogatories.  Fed. R. Civ. P. 56(c)(1); *see also Celotex*, 477 U.S. at 324.

20  　　Due to the nature of the issues presented, challenges to campaign finance laws rarely

21  involve disputed issues of fact, and thus are often proper subject matter for summary judgment.

22  **DISCUSSION**

23  　　In *Buckley v. Valeo*, 424 U.S. 1, 14 (1976) (per curiam), the Supreme Court held that

24  campaign finance regulations that impose expenditure and contribution limitations "operate in an

25  area of the most fundamental First Amendment activities."  "Discussion of public issues and

26  debate on the qualifications of candidates are integral to the operation of the system of government

27  established by our Constitution.  The First Amendment affords the broadest protection to such

28  political expression in order 'to assure (the) unfettered interchange of ideas for the bringing about

of political and social changes desired by the people.'" *Id.* (citation omitted).  "A restriction on the amount of money a person or group can spend on political communication during a campaign necessarily reduces the quantity of expression by restricting the number of issues discussed, the depth of their exploration, and the size of the audience reached." *Id.* at 19.

The crucial distinction, according to the Supreme Court in *Buckley*, is between limits on campaign *expenditures* and campaign *contributions*.  The Supreme Court reasoned that expenditure limits "represent substantial rather than merely theoretical restraints on the quantity and diversity of political speech," whereas contribution limits "entail[] only a marginal restriction upon the contributor's ability to engage in free communication." *Id.* at 20.  Thus:

> A contribution serves as a general expression of support for the candidate and his views, but does not communicate the underlying basis for the support.  The quantity of communication by the contributor does not increase perceptibly with the size of his contribution, since the expression rests solely on the undifferentiated, symbolic act of contributing.  At most, the size of the contribution provides a very rough index of the intensity of the contributor's support for the candidate.  A limitation on the amount of money a person may give to a candidate or campaign organization thus involves little direct restraint on his political communication, for it permits the symbolic expression of support evidenced by a contribution but does not in any way infringe the contributor's freedom to discuss candidates and issues.  While contributions may result in political expression if spent by a candidate or an association to present views to the voters, the transformation of contributions into political debate involves speech by someone other than the contributor.

*Id.* at 21.  The Supreme Court reaffirmed the expenditure-contribution distinction most recently in *Arizona Free Enterprise Club's Freedom Club PAC v. Bennett*, 131 S. Ct. 2806, 2816-17 (2011).

Because of the greater infringement on the core First Amendment rights, expenditure limits are subject to strict scrutiny, "which requires the Government to prove that the restriction 'furthers a compelling interest and is narrowly tailored to achieve that interest.'" *See Citizens United v. Fed. Election Comm'n*, 130 S. Ct. 876, 898 (2010) (citation omitted); *see also Fed. Election Comm'n v. Nat'l Conservative Action Comm.*, 470 U.S. 480, 496 (1985) ("*NCPAC*") (in examining an expenditure limit, the Supreme Court looks to whether it is "narrowly tailored" to serve a "sufficiently strong governmental interest"); *Buckley*, 424 U.S. at 44-45 ("[T]he constitutionality of [an expenditure limit] turns on whether the governmental interests advanced in its support satisfy the exacting scrutiny applicable to limitations on core First Amendment rights of political expression.").  On the other hand, contribution limits are subject to a lower level of

scrutiny ("closely drawn" scrutiny), and are permissible as long as the government demonstrates that they are "closely drawn" to match "a sufficiently important interest." *See Buckley*, 424 U.S. at 25; *see also Randall v. Sorrell*, 548 U.S. 230, 247 (2006) (plurality); *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 737 (2000); *Nixon v. Shrink Missouri Gov't PAC*, 528 U.S. 377, 387-88 (2000) ("*Shrink*") ("[U]nder *Buckley*'s standard of scrutiny, a contribution limit involving 'significant interference' with associational rights, could survive if the Government demonstrated that contribution regulation was 'closely drawn' to match a 'sufficiently important interest,' though the dollar amount of the limit need not be 'fine tuned.'" (internal citations omitted)).[5]

## I.   The $500 per election individual contribution limit in § 27.2935(a).

The parties both move for summary judgment with respect to the constitutionality of § 27.2935(a), which makes it unlawful for any individual to make, or for any candidate or committee to solicit or accept, "a contribution that would cause the total amount contributed by that individual to support or oppose the candidate to exceed $500 for any single election."[6]  The City contends that this case is governed by the general principles set forth in *Buckley*, 424 U.S. 1, and its progeny, which have deferred to the contribution limits imposed by the legislature. Plaintiffs, on the other hand, contend that this is a unique case where specific "danger signs" exist that make the $500 limit on individual contributions unconstitutionally low. *See Randall*, 548 U.S. at 249.   Because it is a contribution limit, § 27.2935(a) must be "closely drawn" to match "a sufficiently important interest." *See Shrink*, 528 U.S. at 387-88; *Buckley*, 424 U.S. at 25.

---

[5] In their motion for summary judgment, Plaintiffs suggest that the Supreme Court's recent decision in *Citizens United*, 130 S. Ct. 876, might have altered the level of scrutiny applicable to contribution limits. They base this on the Supreme Court's remark that "[l]aws that burden political speech are 'subject to strict scrutiny.'" *Id.* at 898.  The Court rejects this contention.  The decision in *Citizens United* addressed only limits on *expenditures*; indeed, the Supreme Court distinguished the case before it from cases discussing limits on contributions. *See, e.g., id.* at 909.  Moreover, the Ninth Circuit post-*Citizens United* reaffirmed that when the government regulates contribution limits, it is held only to the lower "closely drawn" level of scrutiny. *See McKenna*, 2011 WL 6826338, at *7 ("Contribution limits, however, are not subject to strict scrutiny.  They are constitutionally valid 'if the State demonstrates a sufficiently important interest and employs means closely drawn to avoid unnecessary abridgment of associational freedoms.'" (citing *Thalheimer*, 645 F.3d at 1117)); *Thalheimer*, 645 F.3d at 1113 ("*Buckley*'s expenditure-contribution distinction continues to frame the constitutional analysis of campaign finance regulations."); *see also*

[6] To the extent § 27.2935(a) regulates contributions to committees making independent expenditures (i.e., expenditures not controlled by a candidate), that regulation is addressed in conjunction with the discussion of constitutionality of § 27.2936(b). *See infra* Part IV.

1    A.    Legal standard

2        In *Buckley*, the Supreme Court upheld a $1,000 contribution limit, concluding that the

3    interest in preventing corruption and its appearance was "sufficiently important" to justify the

4    limit. *Id.* at 26-29.  The Supreme Court also found the contribution limit before it was "closely

5    drawn." *Id.* at 29-30.  Pointing out that it had "'no scalpel to probe, whether, say, a $2,000 ceiling

6    might not serve as well as $1,000,'" *id.* at 30 (citation omitted), the Supreme Court found no

7    indication that the $1,000 contribution limit would have "any dramatic adverse effect on the

8    funding of campaigns." *Id.* at 21.  The Supreme Court concluded that any distinctions in degree

9    would become significant "only when they can be said to amount to differences in kind." *Id.* at 30.

10   Since *Buckley*, "the [Supreme] Court has consistently upheld contribution limits in other statutes."

11   *Randall*, 548 U.S. at 247 (citing cases).  That is, until *Randall*.

12       In *Randall*, the Supreme Court reiterated that, "[i]n practice, the legislature is better

13   equipped to make . . . empirical judgments [as to contribution limits], as legislators have

14   'particular expertise' in matters related to the costs and nature of running for office." *Id.* at 248.

15   Nonetheless, the Supreme Court concluded that it must recognize the existence of some "lower

16   bound," whereby the contribution limit becomes unconstitutionally low. *Id.*  "That is because

17   contribution limits that are too low can also harm the electoral process by preventing challengers

18   from mounting effective campaigns against incumbent officeholders, thereby reducing democratic

19   accountability." *Id.* at 248-49.  Thus, when faced with contribution limits, a court must determine

20   whether those limits "prevent candidates from 'amassing the resources necessary for effective

21   campaign advocacy;' whether they magnify the advantages of incumbency to the point where they

22   put challengers to a significant disadvantage; in a word, whether they are too low and too strict to

23   survive First Amendment scrutiny." *Id.* at 248 (internal citation omitted).

24       In determining whether the contribution limit in *Randall* was unconstitutionally low, the

25   three-justice plurality first reviewed to see if there were "danger signs" present, that would suggest

26   the contribution limits were "sufficiently low as to generate suspicion that they are not closely

27   drawn." *Id.* at 249.  The plurality found the following "danger signs": (1) the $400 limit was per

28   election cycle, which included both a primary and general election; (2) the limit was well below

1    the limits upheld in *Buckley*, especially when adjusted to reflect its value in 1976 (the year *Buckley*

2    was decided); (3) considered as a whole, the contribution limits were the lowest in the nation; (4)

3    the limit was well below the lowest limit the Supreme Court has previously upheld ($1,075); and

4    (5) the limit was not adjusted for inflation. *Id.* at 249-51.  Having found these "danger signs," the

5    plurality noted that it was required to "review the record independently and carefully with an eye

6    toward assessing the statute's 'tailoring.'" *Id.* at 249 (citation omitted).

7        Having reviewed the record, the plurality was convinced that the contribution limits in

8    *Randall* were "too restrictive," and therefore not "closely drawn."  *Id.* at 253.  It identified the

9    following five factors: (1) the record suggested the limits would "significantly restrict funding

10    available for challengers to run competitive campaigns," *id.* at 253-56; (2) the low limits

11    threatened the right to associate in a political party, *id.* at 256-59; (3) the limits possibly impeded

12    the effective use of volunteers, *id.* at 259-60; (4) the limits were not adjusted for inflation, *id.* at

13    261; and (5) there was no "special justification" to warrant these burdens, *id.* at 261.

14        B.     <u>Analysis</u>

15        To begin with, the City has demonstrated  "a sufficiently important interest."  The Supreme

16    Court has concluded that "preventing corruption or the appearance of corruption are the only

17    legitimate and compelling government interests thus far identified for restricting campaign

18    finances." *NCPAC*, 470 U.S. at 496-97 (1985); *see also Buckley*, 424 U.S. at 26-27 ("To the

19    extent that large contributions are given to secure a political quid pro quo from current and

20    potential office holders, the integrity of our system of representative democracy is undermined.

21    Although the scope of such pernicious practices can never be reliably ascertained, . . . the problem

22    is not an illusory one."); *id.* at 27 ("Of almost equal concern as the danger of actual quid pro quo

23    arrangements is the impact of the appearance of corruption stemming from public awareness of the

24    opportunities for abuse inherent in a regime of large individual financial contributions.").

25        In this case, the record sufficiently demonstrates corruption in the San Diego municipal

26    government.  The history of corruption stretches back to at least the early 1970s, when the City

27    Mayor and eight City Council members were indicted on corruption charges in the Yellow Cab

28    scandal.  (*See* Fulhorst Decl ¶ 5; Erie Decl. ¶ 6; *see also* Def. RJN, Exs. 6, 7, 8, 9.)  Then, in 1985,

1    San Diego Mayor Roger Hedgecock resigned after being convicted of concealing illegal campaign

2    contributions.  (Fulhorst Decl. ¶ 6; Erie Decl. ¶¶ 7, 8; *see also* Def. RJN, Exs. 8, 10.)  In 2001, City

3    Council member Valerie Stallings resigned after pleading guilty to corruption charges.  (Fulhorst

4    Decl. ¶ 7; Erie Decl. ¶ 9; *see also* Def. RJN, Exs. 8, 11.)  Most recently, three City Council

5    members were indicted on fraud and conspiracy counts involving channeling campaign

6    contributions from the adult entertainment industry in exchange for an agreement to repeal the no-

7    touch laws in strip clubs.  (Fulhorst Decl. ¶ 8; Erie Decl. ¶ 10; *see also* Def. RJN, Exs. 8, 12, 13.)

8    Indeed, the Ninth Circuit recently acknowledged that its case law "contains a vivid illustration of

9    corruption in San Diego municipal government involving campaign contributions timed to

10   coincide with the donors' particular business before the city council."  *Thalheimer*, 645 F.3d at

11   1123 n.3; *see also United States v. Inzunza*, 638 F.3d 1006 (9th Cir. 2011) (affirming the conviction

12   of a former San Diego Council member on charges stemming from a bribery scandal).

13          Next, applying the *Randall* analysis, there are no sufficient "danger signs" in this case that

14   would suggest the contribution limit is not closely drawn.  Plaintiffs first argue that the $500 limit

15   is impermissibly low because the City's own Ethics Commission, the body established "to

16   monitor, administer, and enforce the City's governmental ethics laws [and] propose new

17   governmental ethics law reforms," *see* San Diego Municipal Code, ch. 2, art. 6, div. 4, § 26.0401,

18   has recommended that the contribution limit be increased to $1,000.  (*See* SDEC Minutes for

19   Meeting of Thursday, May 8, 2008 (attached as Exhibit 5 to the FAVC) [Doc. No. 84-2].)

20   However, as this Court previously noted in denying Plaintiffs' motion for preliminary injunction,

21   "the fact that the Commission recommended a higher limit does not necessarily mean that a lower

22   amount would be unconstitutional."  (*See* Prelim. Inj. Order, at 8 [Doc. No. 42].)  As the Supreme

23   Court observed in *Buckley*, the Court has "'no scalpel to probe, whether, say, a [$1,000] ceiling

24   might not serve as well as [$500].'"  *See* 424 U.S. at 30 (citation omitted).

25          Plaintiffs next contend that the $500 contribution limit is significantly lower than 8 of the

26   15 largest cities in the country, including New York, Chicago, Houston, Philadelphia, Dallas,

27   Detroit, Indianapolis, and Columbus.  (*See* Def. RJN, Ex. 24 [Doc. No. 115-32].)  While that might

28   be true, the limit also appears to be comparable with the contribution limits in Los Angeles

- 11 -

($500/$1,000), Phoenix ($488), San Antonio ($500/$1,000), San Jose ($200/$500), Jacksonville ($500/$500), and San Francisco ($500/$500).  (*See id.*)  The fact that the challenged limit is lower than similar limits in several other cities is a factor to consider, but does not necessarily mean it is unconstitutionally low.  *See Montana Right to Life Ass'n v. Eddleman*, 343 F.3d 1085, 1095 (9th Cir. 2003) ("As long as the limits are otherwise constitutional, it is not the prerogative of the courts to fine-tune the dollar amounts of those limits.").  Rather, the Court should also consider the limits previously upheld by the courts.  *See Randall*, 548 U.S. at 250-51.  In this case, the $500 limit ($1,000 per election cycle) is comparable to other contribution limits previously  upheld.  *See, e.g.*, *Shrink*, 528 U.S. 377 ($275 to $1,075 for statewide office); *Buckley*, 424 U.S. 1 ($1,000 for federal office); *Eddleman*, 343 F.3d 1085 ($100, $200, and $400 for statewide office).

Plaintiffs also argue that, adjusted for inflation to 1976 dollars (the year *Buckley* was decided), the City's $500 limit amounts to only $125, compared with the $1,000 upheld in *Buckley*.  However, just as with the fact that the limit here is lower than in some other cities, the Court considers this as only one factor in the analysis, and not as *per se* dispositive of the limit's constitutionality.  *See Shrink*, 528 U.S. at 388 ("[T]he dollar amount of the limit need not be 'fine tuned.'" (citing *Buckley*, 424 U.S. at 30)); *Eddleman*, 343 F.3d at 1095 (same).

Accordingly, the Court does not believe there are sufficient "danger signs" present in this case requiring the Court to conduct an independent review of the record.  However, even if the "danger signs" were present, a review of the *Randall* factors does not suggest that the $500 individual contribution limit in this case is "too restrictive."  *See* 548 U.S. at 253.

First, unlike *Randall*, the record in this case does not suggest that the $1,000 limit "significantly restrict[s] funding available for challengers to run competitive campaigns."  *See id.* at 253-56.  The only evidence that Plaintiffs provide is that San Diego election results show that since 1973 (the year contribution limits were enacted), in races where an incumbent sought reelection, the incumbent was reelected 54 times, while the challenger was successful only 8 times.  (*See* Declaration of Noel H. Johnson in Support of Plaintiffs' Opposition ("Johnson Decl.") ¶ 6 [Doc. No. 121-2]; *see also id.*, Exs. 1, 2 [Doc. Nos. 121-4, 121-5].)  However, because Plaintiffs do not indicate how often the incumbents were successful in gaining reelection *before*

the contribution limits went into effect, the Court cannot determine whether these limits "significantly restrict" the funding available to challengers. *See Randall*, 548 U.S. at 253. Moreover, as the City points out, the incumbents are generally successful in gaining reelection across California, regardless of the contribution limits in place. (*See* Declaration of Thad Kousser in Support of City's Reply ¶¶ 5, 6, 7 [Doc. No. 122-1].) Thus, according to a study done by the researchers at Sacramento State University working with the Secretary of State's Office, the average incumbent reelection rate in all city council races in California from 1995 through 2008 was 78.7%. (*Id.* ¶ 5.) This does not appear to be significantly different from the 87% reelection rate in San Diego (54/62) alleged by Plaintiffs. Similarly, the incumbent reelection rates in California's largest cities between 2002 and 2008 are almost identical to that of San Diego. (*See id.* ¶¶ 7, 8; *see also id.*, Ex. B.) Accordingly, the record does not demonstrate that there is any direct causation between the contribution limits and the challengers' ability to defeat incumbents.

Second, in light of the separate provision in the ECCO for contributions to a political party, the $500 limit on individual contributions does not by itself threaten the right to associate in a political party. *See Randall*, 548 U.S. at 256-59. Third, unlike *Randall*, the record here does not demonstrate that the $500 contribution limit possibly impedes the effective use of volunteers. *See id.* at 259-60. Fourth, also unlike in *Randall*, 548 U.S. at 261, the $500 limit in this case *is* adjusted for inflation. Fifth, because there are no serious burdens implicated by the $500 contribution limit, the record need not disclose some "special justification" for the limit. *See id.*

As such, "[t]aken together," the *Randall* factors do not suggest that the $500 individual contribution limit in this case "threaten[s] to inhibit effective advocacy" by challengers, "mute[s] the voice of political parties," or otherwise imposes disproportional burdens on First Amendment interests. *See Randall*, 548 U.S. at 261-62. Neither does the record demonstrate that the $500 contribution limit is significantly different from the $1,000 limit suggested by the City's Ethics Commission, so as to amount to a "difference[] in kind." *See Buckley*, 424 U.S. at 30.

Accordingly, the Court finds that the $500 contribution limit imposed by § 27.2935(a) is closely drawn to match a sufficiently important anti-corruption interest, and therefore **GRANTS** the City's motion for summary judgment and **DENIES** Plaintiffs' respective motion.

1   **II.      The temporal contribution limit in § 27.2938(a).**

2          The parties next dispute the constitutionality of § 27.2938(a), which makes it "unlawful for

3   any candidate or controlled committee seeking elective City office to solicit or accept

4   contributions prior to the twelve months preceding the primary election for the office sought."

5          At the outset, the Court rejects Plaintiffs' argument that this limit is subject to strict

6   scrutiny because it is effectively a *complete ban* on contributions prior to the twelve-month period.

7   The Supreme Court has indicated that whether the challenged law imposes a limit or a complete

8   ban is considered at the tailoring stage, *not* in deciding which level of scrutiny to apply.  *See Fed.*

9   *Election Comm'n v. Beaumont*, 539 U.S. 146, 162 (2003) ("It is not that the difference between a

10  ban and a limit is to be ignored; it is just that the time to consider it is when applying scrutiny at

11  the level selected, not in selecting the standard of review itself."); *see also Thalheimer*, 645 F.3d at

12  1124 n.4 (same).  When selecting the standard of review, the Ninth Circuit case law is clear that a

13  contribution ban such as this is subject to the lower level of scrutiny.[7]  *See McKenna*, 2011 WL

14  6826338, at *7 ("The district court construed the 21–day contribution limit as a 'ban on large

15  contributions' and therefore applied strict scrutiny.  Contribution limits, however, are not subject

16  to strict scrutiny.  They are constitutionally valid 'if the State demonstrates a sufficiently important

17  interest and employs means closely drawn to avoid unnecessary abridgment of associational

18  freedoms.'" (citing *Thalheimer*, 645 F.3d at 1117)).

19         Second, the Court also rejects Plaintiffs' argument that strict scrutiny applies because the

20  temporal limit on contributions in effect limits the candidates' ability to make expenditures.  As

21  the Supreme Court noted in *Buckley*, "[w]hile contributions may result in political expression if

22  spent by a candidate or an association to present views to the voters, the transformation of

23  contributions into political debate involves speech by someone *other than the contributor*."  424

24  U.S. at 21 (emphasis added).  Accordingly, lower level of scrutiny applies.

25         Third, the Court rejects Plaintiffs' argument that the City does not have a sufficiently

26  important interest in this case.  Plaintiffs argue that if the City's anti-corruption interest is served

27  _____

28         [7] Because the case law on the applicable standard of review is clear, the Court also rejects
    Plaintiffs' argument that the temporal limitation is subject to strict scrutiny because it amounts to a
    prior restraint.  *See Ward v. Rock Against Racism*, 491 U.S. 781 (1989).

by the $500 individual contribution limitation in § 27.2935(a), that interest cannot also be served

by the temporal limitation in § 27.2938(a).  According to the research by the SDEC staff, however,

"remote contributions are more likely to create an appearance of corruption."  (Fulhorst Decl. ¶

18.)  Plaintiffs do not seriously dispute this determination.  Accordingly, the Court finds that the

City's anti-corruption interest is also sufficiently important to support the temporal limit on direct

contributions.  *See Randall*, 548 U.S. at 248 ("In practice, the legislature is better equipped to

make . . . empirical judgments [as to contribution limits], as legislators have 'particular expertise'

in matters related to the costs and nature of running for office.").

Fourth, the twelve-month limit is closely drawn to serve the City's anti-corruption interest.

As previously noted, the Court has "'no scalpel to probe, whether, say, a [two-year limit] might

not serve as well as [the twelve-month limit].'"  *See Buckley*, 424 U.S. at 30 (citation omitted).

Moreover, the Ninth Circuit has already opined that the temporal limit at issue in this case is "an

even more 'marginal restriction upon the contributor's ability to engage in free communication'"

than the dollar cap involved in *Buckley*.  *See Thalheimer*, 645 F.3d at 1122 (citing *Buckley*, 424

U.S. at 20-21).  Although made at the preliminary injunction stage, this legal ruling is binding on

the Court under the law-of-the-case doctrine.  *See Ranchers Cattlemen Action Legal Fund United*

*Stockgrowers of Am. v. U.S. Dep't of Agriculture*, 499 F.3d 1108, 1114 (9th Cir. 2007) (noting that

while "the district court should abide by 'the general rule' that [the Ninth Circuit's] decisions at

the preliminary injunction phase do not constitute the law of the case," "[a]ny of [the Ninth

Circuit's] conclusions on pure issues of law . . . are binding" (internal citations omitted)).

Keeping in mind that the temporal contribution limit amounts to only a "marginal

restriction," *see Thalheimer*, 645 F.3d at 1122, the Court concludes that it is closely drawn to serve

an important government interest.  The only harm Plaintiffs can point to is their desire, but

complete inability due to the effect of § 27.2938(a), to solicit or contribute prior to the twelve-

month period.[8]  While this harm is not illusory, as the Ninth Circuit suggested, Plaintiffs' "scant

---

[8] "[The ECCO] prohibits Mr. Thalheimer from soliciting, accepting, and using contributions and Mr. Nienstedt from contributing to the candidates he supports.  Both want to engage in this activity at the time they prefer, not when permitted by the government.  Based on his past experience, Mr. Thalheimer believes he must raise funds before the permitted time-frame if he is to be a

1    evidence" of harm suffered from the temporal limit is not sufficient evidence of the sort of "danger

2    signs" that would compel the Court to show less deference to the judgment of the San Diego

3    officials. *See Thalheimer*, 645 F.3d at 1123-24 (citing *Randall*, 548 U.S. at 249).

4        Finally, the Ninth Circuit's recent decision in *McKenna* appears to foreclose Plaintiffs'

5    arguments. In *McKenna*, the Ninth Circuit concluded that Washington's ban on political

6    committees from accepting from any one person contributions exceeding $5,000 within 21 days of

7    a general election was not closely drawn to achieve the state's important interest in informing the

8    electorate. 2011 WL 6826338, at **7-8. In doing so, the Ninth Circuit explicitly noted that the

9    temporal limit at issue in that case was different from the one involved here:

> In *Thalheimer*, we upheld a San Diego ordinance making it unlawful for a
> candidate to solicit or accept contributions until the 12 months preceding the
> primary election for the office sought. The rule did not impose a serious burden
> because candidates could concentrate their fundraising activities during the 12
> months leading up to the election. In addition, the ban served an important
> governmental interest in the prevention of actual and perceived corruption "because
> those contributions made near an election are clearer expressions of political
> speech, whereas off-year contributions are more likely linked to business the donor
> has before the city, thus creating the appearance of quid pro quo 'corruption by the
> sale of influence.'" The rule was therefore closely drawn to a sufficiently important
> state anticorruption interest.

16   *McKenna*, 2011 WL 6826338, at *8 n.13 (internal citations omitted).[9]

17       Accordingly, the Court concludes that the City's twelve-month temporal limit on direct

18   contributions to the candidates is closely drawn to meet the City's important anti-corruption

19   interest, and therefore **GRANTS** the City's motion for summary judgment as to § 27.2938(a) and

20   **DENIES** Plaintiffs' respective motion.

---

competitive candidate against an incumbent. And, Mr. Nienstedt wants his chosen candidate to have
as great a chance for success as possible, and he wants to contribute to his campaign now, even in
non-government-approved time-frames." (Pl. Motion, at 11-12 (internal citations omitted).)

[9] Plaintiffs also attempt to distinguish the two cases this Court and the Ninth Circuit relied
upon at the preliminary injunction stage: *North Carolina Right to Life v. Bartlett*, 168 F.3d 705 (4th
Cir. 1999), and *Gable v. Patton*, 142 F.3d 940 (6th Cir. 1998). In *Gable*, the Sixth Circuit upheld
Kentucky's prohibition on gubernatorial candidates accepting contributions during the 28 days
preceding a primary or general election. 142 F.3d at 951. In *Bartlett*, the Fourth Circuit upheld a
provision that prevented lobbyists and political committees that employ lobbyists from contributing
to state legislators and candidates while the legislature is in session. 168 F.3d at 714–15. As the
Ninth Circuit noted, Plaintiffs' attempts to distinguish these cases are unavailing in light of the
deference owed to the legislature in choosing the length of the temporal period. *See Thalheimer*, 645
F.3d at 1122-24; *see also McKenna*, 2011 WL 6826338, at *8 n.13.

1    **III.    Temporal limit as to candidates spending their own funds.**

2        Plaintiffs also move for summary judgment with respect to § 27.2938(a) to the extent the

3    City interprets it to prohibit candidates from spending their own funds prior to the twelve-month

4    period.  The City has decided not to defend that position.  *See* Def. Motion, at 13 ("The City does

5    not defend the constitutionality of this interpretation in this motion.").  Accordingly, the Court

6    **GRANTS** Plaintiffs' motion as to the City's enforcement of § 27.2938(a) to candidates spending

7    their own funds in support of their own candidacies prior to the twelve-month period.

8    **IV.    Contributions to committees making independent expenditure (§ 27.2936(b)).**

9        Plaintiffs seek summary judgment as to the constitutionality of § 27.2936(b), which makes

10   it "unlawful for any general purpose recipient committee to use a contribution for the purpose of

11   supporting or opposing a candidate unless the contribution is attributable to an individual in an

12   amount that does not exceed $500 per candidate per election."  Among other things, this provision

13   regulates contributions to committees not controlled by a candidate that make independent

14   expenditures.  The City does not contest Plaintiffs' motion on this ground.  (*See* Def. Opp., at 23.)

15       In *Citizens United*, the Supreme Court held that "independent expenditures . . . do not give

16   rise to corruption or the appearance of corruption."  130 S. Ct. at 909.  Moreover, several Courts of

17   Appeal—including the Ninth Circuit—have already struck similar provisions restricting

18   contributions to committees that make independent expenditures.  *See, e.g.*, *Long Beach Area*

19   *Chamber of Commerce v. City of Long Beach*, 603 F.3d 684, 696-99 (9th Cir. 2010) (striking down

20   a regulation that provided that any person who makes independent expenditures supporting or

21   opposing a candidate shall not accept any contribution in excess of $350 to $650); *SpeechNow.org*

22   *v. Fed. Election Comm'n*, 599 F.3d 686, 694-95 (D.C. Cir. 2010) ("In light of the [Supreme]

23   Court's holding [in *Citizens United*] as a matter of law that independent expenditures do not

24   corrupt or create the appearance of *quid pro quo* corruption, contributions to groups that make

25   only independent expenditures also cannot corrupt or create the appearance of corruption."); *North*

26   *Carolina Right to Life, Inc. v. Leake*, 525 F.3d 274, 292-93 (4th Cir. 2008).

27       For the foregoing reasons, the Court **GRANTS** Plaintiffs' motion for summary judgment

28   with respect to the contribution limits to committees making independent expenditures under §§

27.2936(b) and 27.2935(a).  The City is enjoined from enforcing the $500 contribution limit as it applies to contributions to independent expenditure committees, regardless of whether independent expenditures are the *only* expenditures that those committees make.  Rather, to the extent those committees make independent expenditures, the $500 contribution limit is unconstitutional.  *See Emily's List v. Fed. Election Comm'n*, 581 F.3d 1, 11-12 (D.C. Cir. 2009).  On the other hand, to prevent circumvention of contribution limits by individual donors, when a committee that otherwise makes independent expenditures *decides to make contributions directly to a candidate or a party*, the City may enforce the $500 contribution limit.  *See id.* at 12.  Stated another way: an independent expenditure committee that makes expenditures to support a candidate "does not suddenly forfeit its First Amendment rights when it decides also to make direct contributions to parties or candidates.  Rather, it simply must ensure, to avoid circumvention of individual contribution limits by its donors, that its contributions to parties or candidates come from a hard-money account" subject to the source and amount limitations in § 27.2936(b).  *See id.*

**V.    Sections 27.2950 and 27.2951, and related statutes, barring non-individual entities (including political parties and corporations) from contributing to candidates**.

The parties move for summary judgment with respect to the ECCO's ban on contributions from non-individuals, including political parties, corporations, labor unions, and other organizations.  Specifically, § 27.2950(a) bars candidates from accepting contributions from non-individuals.  Subsection (b) bars such non-individuals from making such contributions, and subsection (c) bars committees supporting candidates from taking contributions from non-individuals.  Relatedly, § 27.2951 bars the use of organizational bank accounts for candidate contributions and contributions to committees supporting candidates.[10]  Finally, § 27.2936(b) requires that any contributions to general purpose recipient committees come from "individuals."

A.    Political parties

The City contends that the complete ban on contributions from political parties to candidates is justified under the Supreme Court's decision in *Federal Election Commission v.*

---

[10]  Because the solicitation and acceptance of contributions from non-individuals; the contributions by those non-individuals; and the making and acceptance of contributions drawn from those non-individuals' accounts all raise the same concerns, this section analyzes the relevant ECCO provisions jointly.  *See* ECCO § 27.2950(a), (b), (c); *id.* § 27.2951(a).

1   *Colorado Republican Federal Campaign Committee*, 533 U.S. 431 (2001) ("*Colorado II*"), and is

2   permissible in this case because political parties have other avenues of exercising their First

3   Amendment rights.  Plaintiffs, on the other hand, contend that the complete ban is impermissible

4   under *Randall*, 548 U.S. 230, because it completely silences the political parties.

5        *Colorado II* involved a challenge to the Federal Elections Campaign Act's limits on

6   political parties' coordinated expenditures, which were capped based on the district size and

7   relative cost of the media market.  The limits ranged from $67,500 to $1,636,438 for candidates

8   for the U.S. Senate, and from $33,780 to $67,560 for candidates for the U.S. House of

9   Representatives.  *Colorado II*, 533 U.S. at 439.  Parties were also allowed to give up to $5,000 in

10   direct contributions to the candidates.  *Id.* at 442 n.7.  The Supreme Court concluded that the

11   parties' coordinated spending could be restricted to further the government's anti-circumvention

12   interest.  *Id.* at 456.  In doing so, the Supreme Court noted that political parties were in the same

13   position as other individuals and political action committees with regard to coordinated

14   expenditures, and therefore did not warrant special treatment.  *Id.* at 455-56.

15        Five years later, the Supreme Court decided *Randall*, where it suggested that political

16   parties do in fact have a special role requiring unique attention when analyzing contribution limits.

17   In *Randall*, a three-justice plurality held that the $200 to $400 contribution limit, which applied

18   equally to individuals, committees, and political parties, was not closely drawn.  548 U.S. at 249-

19   51.  Among other factors, the plurality concluded that the law's "insistence that political parties

20   abide by exactly the same low contribution limits that apply to other contributors threaten[ed]

21   harm to a particularly important political right, the right to associate in a political party."  *Id.* at

22   256.  Notably, the plurality highlighted the fact that the law "severely limit[ed] the ability of a

23   party to assist its candidates' campaigns by engaging in coordinated spending on advertising,

24   candidate events, voter lists, mass mailings, even yard signs."  *Id.* at 257.  Moreover, the law

25   "discourage[d] those who wish to contribute small amounts of money to a party, amounts that

26   easily comply with individual contribution limits."  *Id.*

27        *Randall* is consistent with *Colorado II*.  Addressing *Colorado II* specifically, the plurality

28   in *Randall* indicated that the contribution limits in that case were "significantly higher" than in the

1    case before it, and therefore were "far less problematic." *Id.* at 258. Moreover, the plurality noted

2    that in *Colorado II*, the contribution limits on political parties were much higher than the limits

3    applicable to contributions from individuals to candidates, "thereby reflecting an effort by

4    Congress to balance (1) the need to allow individuals to participate in the political process by

5    contributing to political parties that help elect candidates with 2) the need to prevent the use of

6    political parties 'to circumvent contribution limits that apply to individuals.'" *Id.* at 258-59

7    (citation omitted). The plurality concluded that by placing identical limits upon contributions to

8    candidates, whether made by an individual or a political party, the challenged law gave "*no weight

9    at all*" to the first consideration. *Id.* at 259. Rather, the law's contribution limits "'would reduce

10   the voice of political parties' in Vermont to a 'whisper.'" *Id.* (citation omitted).

11          The *Randall* analysis is appropriate in this case. It is an "accepted understanding" that a

12   political party "combines its members' power to speak by aggregating contributions and

13   broadcasting messages more widely than individual contributors generally could afford to do, and

14   the party marshals this power with greater sophistication than individuals generally could, using

15   such mechanisms as speech coordinated with a candidate." *See Colorado II*, 533 U.S. at 453. In

16   this case, similar to *Randall*, the City failed to provide for a contribution limit applicable to

17   political parties that is sufficiently higher than that applicable to contributions from individuals.

18   Indeed, although the challenged law in *Randall* had identical limits for both contributions, the City

19   in this case *completely bans* contributions from political parties, while allowing individuals to

20   contribute up to $500. *Compare* ECCO § 27.2935(a) ($500 individual contribution limit), *with id.*

21   § 27.2950(b) (prohibiting any contribution by a non-individual).

22          By fully prohibiting contributions by political parties, the City has failed to balance (1)

23   "the need to allow individuals to participate in the political process by contributing to political

24   parties that help elect candidates" with (2) "the need to prevent the use of political parties 'to

25   circumvent contribution limits that apply to individuals.'" *See Randall*, 548 U.S. at 258-59.

26   Rather than simply "'reduce the voice of political parties' . . . to a 'whisper,'" *see id.* at 259, this

27   complete ban in effect silences the political parties in San Diego.

28          The City's arguments to the contrary are not persuasive. The City argues that the ban on

- 20 -

contributions does not prevent the political parties from making unlimited independent expenditures (raised from individuals subject to the $500 contribution limit) and engaging in other party-building and candidate support activities.  However, this does not address the complete inability of the political parties to assist candidates they support by engaging in coordinated spending.[11]  *See id.* at 256-57.  The City responds that the parties are not precluded from spending unlimited sums in coordination with the candidate on communications to party members.  As Plaintiffs point out, however, in light of the City's non-partisan elections, they seek to coordinate their spending to communicate with party members and non-members alike.

For the foregoing reasons, the City has failed to demonstrate that the complete ban on contributions from political parties is "closely drawn" to the City's important anti-corruption interest.  Accordingly, the Court **GRANTS** Plaintiffs' motion as to §§ 27.2950 and 27.2951, to the extent those provisions ban contributions from political parties, and **DENIES** the City's motion.

> B.    $1,000 contribution limit on political parties.

The parties next move for summary judgment as to § 27.2934(b), which the City enacted after this Court preliminarily enjoined the application of §§ 27.2950 and 27.2951 as to the political parties.  Section 27.2934(b) makes it "unlawful for a political party committee to make, or for a candidate or controlled committee to solicit or accept, a contribution that would cause the total amount contributed by the political party committee to the candidate and the candidate's controlled committee to exceed $1,000 for any single City candidate election."  The $1,000 limit is adjustable for inflation.  *See* ECCO §§ 27.2934(c), 27.2937.  Because it is a contribution limit, it is subject to the "closely drawn" scrutiny.  *See Buckley*, 424 U.S. at 25.  The parties also agree that the provision is subject to the *Randall* analysis.

---

[11] The City's citation to the recent decision in *Republican Party of New Mexico v. King*, No. 11-CV-900 WJ/KBM, Doc. No. 38 (D.N.M. Jan. 5, 2012), is not persuasive.  In *King*, the district court denied in part plaintiffs' motion for a preliminary injunction, rejecting the plaintiffs' broad reading of *Randall* and concluding that the plaintiffs failed to offer "further support for the proposition that subjecting political parties and individuals to equal contribution limits, *without more*, violates the First Amendment."  *Id.*, slip op. at 11 (emphasis added).  As noted above, in this case, the City *failed* to provide equal contribution limits for political parties and individuals.  Moreover, as is discussed further with regard to the City's new $1,000 limit on contributions by political parties, *see infra* Part V.B, there are significantly more "danger signs" at play here than seems to have been the case in *King*, where the plaintiffs appear to have relied *solely* on the fact that the state provided equal limits for contributions by individuals and political parties.  *See id.*, slip op. at 10-12.

Applying the *Randall* analysis, there appear to be sufficient "danger signs" present here that would suggest the $1,000 political party contribution limit is "sufficiently low as to generate suspicion that [it is] not closely drawn." *See* 548 U.S. at 249. On the one hand, the limit amounts to $2,000 per election cycle, which is five times more than the limit struck down in *Randall*. On the other hand, the limit is significantly lower than those upheld in both *Buckley* and *Colorado II*. Thus, in *Buckley*, the Supreme Court upheld contribution limits of $1,000 for individuals and $5,000 for political committees. 424 U.S. at 34-35. As Plaintiffs point out, *Buckley*'s $5,000 limit for political committees, adjusted for inflation, equals $19,896.40 today—almost twenty times the City's challenged limit. (*See* Pl. Opp., at 15.) Similarly, in *Colorado II*, the Supreme Court upheld limits that were "significantly higher" than the City's limit: "at least $67,560 in coordinated spending and $5,000 in direct cash contributions for U.S. Senate candidates, and at least $33,780 in coordinated spending and $5,000 in direct cash contributions for U.S. House candidates." *See Randall*, 548 U.S. at 258 (citing *Colorado II*, 533 U.S. at 438-39 & n.3, 442 n.7). Finally, the plurality in *Randall* noted that Missouri—whose $1,075 individual limit the Supreme Court upheld in *Shrink*, 528 U.S. 377—enacted limits on contributions by political parties 10 times higher than limits on contributions by individuals. *See* 548 U.S. at 252.

In addition, when compared to other limits around the country, the City's $1,000 limit appears to be "sufficiently low as to generate suspicion that [it is] not closely drawn." *See* 548 U.S. at 249-51. On the one hand, as the City points out, the limit is greater than the limits in San Francisco ($500/$500) and San Jose ($200/$500). (*See* Def. RJN, Ex. 24.) Both of those cities, however, are considerably smaller than San Diego. On the other hand, the City's $1,000 limit is significantly smaller than the limits applicable in other large cities: New York ($2,750/$4,950), Chicago (no limit), Houston ($10,000/$10,000), Philadelphia ($10,000 per year), Phoenix ($10,440/$10,440), Dallas ($2,500/$10,000), Detroit ($34,000 per cycle), Jacksonville ($50,000), Indianapolis (no limit), Columbus (no limit). (*See* Def. RJN, Ex. 24.) Furthermore, although state and federal contribution limits provide poor comparisons, it is notable that 20 states, including California, allow political parties to contribute unlimited sums to their candidates in some fashion. (*See* Johnson Decl., Ex. 2; *see also* Def. RJN, Ex. 27.) Likewise, national political parties may

1   make direct cash contributions of $5,000 plus coordinated spending of $43,100 to their candidates

2   for Senate.  *See* Federal Election Commission ("FEC"), Contribution Limits for 2011-2012,

3   *available at* http://www.fec.gov/info/ contriblimits1112.pdf (last visited on Jan. 3, 2012).  National

4   political parties may also make coordinated expenditures with their Senate candidates in amounts

5   that range from $88,400 to $2,458,500.  *See* FEC, 2011 Coordinated Party Expenditure Limits,

6   *available at* http://www.fec.gov/info/charts_441ad_2011.shtml (last visited Jan. 3, 2012).

7        In light of the above "danger signs," the Court needs to "review the record independently

8   and carefully with an eye toward assessing the statute's 'tailoring.'"  *See Randall*, 548 U.S. at 249

9   (citation omitted).  The Court does so by applying the five *Randall* factors.

10       Applying the first *Randall* factor, it appears that the $1,000 contribution limit does

11  "significantly restrict funding available for challengers to run competitive campaigns."  *See id.* at

12  253-56.  This factor looks at whether the contribution limit would "reduce[] the funds available" to

13  the challengers.  *Id.* at 253.  In this case, as the City itself acknowledges, after the Court enjoined

14  the ban on contributions by political parties, but before the $1,000 limit was enacted, Plaintiff

15  Republican Party of San Diego made a $20,000 contribution to a single City Council candidate.

16  (*See* Defendant's Separate Statement of Uncontroverted Facts ¶ 12 [Doc. No. 115-2]; *see also*

17  Fulhorst Decl. ¶ 23; Def. RJN, Ex. 29.)  With the $1,000 limit now in place, the Republican Party

18  of San Diego can no longer make similar contributions to the candidates of its choosing.

19  Accordingly, the record suggests that the $1,000 limit on contributions by political parties does

20  "reduce[] the funds available" to the challengers.  *See Randall*, 548 U.S. at 253.

21       Applying the second *Randall* factor, it appears that the $1,000 contribution limit, although

22  not identical to the limit imposed on individual contributors ($500), is nonetheless sufficiently low

23  that it "threatens harm to a particularly important right, the right to associate in a political party."

24  *See id.* at 256.  As previously noted, it is an "accepted understanding" that a political party

25  "combines its members' power to speak by aggregating contributions and broadcasting messages

26  more widely than individual contributors generally could afford to do, and the party marshals this

27  power with greater sophistication than individuals generally could, using such mechanisms as

28  speech coordinated with a candidate."  *See Colorado II*, 533 U.S. at 453.  In *Randall*, the plurality

noted that Vermont's $200 to $400 limit on contributions by political parties "severely limit[ed]

the ability of a party to assist its candidates' campaign by engaging in coordinated spending."  548

U.S. at 257.  The plurality gave the following example:

> Suppose that many individuals do not know Vermont legislative candidates
> personally, but wish to contribute, say, $20 or $40, to the State Republican Party,
> with the intent that the party use the money to help elect whichever candidates the
> party believes would best advance its ideals and interests—the basic object of a
> political party.  Or, to take a more extreme example, imagine that 6,000 Vermont
> citizens each want to give $1 to the State Democratic Party because, though
> unfamiliar with the details of the individual races, they would like to make a small
> financial contribution to the goal of electing a Democratic state legislature.  And
> further imagine that the party believes control of the legislature will depend on the
> outcome of three (and only three) House races.  The Act prohibits the party from
> giving $2,000 (of the $6,000) to each of its candidates in those pivotal races.
> Indeed, it permits the party to give no more than $200 to each candidate, thereby
> thwarting the aims of the 6,000 donors from making a meaningful contribution to
> state politics by giving a small amount of money to the party they support.  Thus,
> the Act would severely inhibit collective political activity by preventing a political
> party from using contributions by small donors to provide meaningful assistance to
> any individual candidate.

*Id.* at 257-58 (internal citation omitted).  The same problem is applicable here.  The City's limit on

contributions by political parties is merely twice that of individuals, even though political parties

are meant to assist their members "by aggregating contributions and broadcasting messages more

widely than individual contributors generally could afford to do."  *See Colorado II*, 533 U.S. at

453.  Just like in *Randall*, imagine that 6,000 San Diegans each wanted to give $1 to Plaintiff

Republican Party of San Diego because, though unfamiliar with the details of the individual races,

they would like to make a small financial contribution to the goal of electing a Republican City

Council member.  Section 27.2934(b) prohibits Plaintiff from giving the whole amount to the

candidate of its choice.  Rather, it permits Plaintiff to give no more than $2,000 to that candidate,

"thereby thwarting the aims of the 6,000 donors from making a meaningful contribution to [city]

politics by giving a small amount of money to the party they support."  *See Randall*, 548 U.S. at

257-58.  As a result, just as in *Randall*, § 27.2934(b) "severely inhibit[s] collective political

activity by preventing a political party from using contributions by small donors to provide

meaningful assistance to any individual candidate."  *See* 548 U.S. at 257-58.

The above fact, and the fact that the limit on contributions by political parties is only twice

that of the individual limit, appears to give "no weight at all" to the required balance between: (1)

1   "the need to allow individuals to participate in the political process by contributing to political

2   parties that help elect candidates" with (2) "the need to prevent the use of political parties 'to

3   circumvent contribution limits that apply to individuals.'" *See id.* at 258-59 (citation omitted).

4   Thus, just like in *Randall*, the low contribution limit in this case appears to "'reduce the voice of

5   political parties' in [San Diego] to a 'whisper.'" *See id.* at 259 (citation omitted).

6          The third and fourth *Randall* factors support the City. Thus, the City's law does not appear

7   to include volunteer activity within the definition of contribution. *See* ECCO § 27.2903

8   (incorporating Cal. Gov't Code § 82105); Cal. Gov't Code § 82105(g) (exempting volunteer

9   activity). Similarly, § 297.2934 is adjusted for inflation. *See* ECCO §§ 27.2934(c), 27.2937.

10         As for the fifth factor, apart from its stated anti-corruption and anti-circumvention interests,

11   the City fails to provide any "special justification" to justify a contribution limit that is so low and

12   so restrictive. *See Randall*, 548 U.S. at 261. However, as Plaintiffs persuasively argue, it is

13   unlikely that this limit can be upheld on the basis of the City's anti-corruption interest. Political

14   parties are unlike other individuals and entities because the candidates *do* expressly associate with

15   them and vote on issues advocated/supported by them. In light of this, the Court cannot say, for

16   example, that a Republican politician is necessarily "corrupt"—or that there is an appearance of

17   corruption—just because that politician votes to pass issues supported by the Republican Party

18   after he or she takes office. To the contrary, that is the exact purpose of our political party system.

19   As for the City's anti-circumvention interest, while it is a legitimate interest, *see Colorado II*, 533

20   U.S. at 456, as discussed above, it does not appear that the $1,000 limit in this case is "closely

21   drawn" to meet that interest. *See Randall*, 548 U.S. at 258-59.

22         The Court must always be mindful that it has "'no scalpel to probe, whether, say, a $2,000

23   ceiling might not serve as well as $1,000.'" *See Buckley*, 424 U.S. at 30 (citation omitted). It is

24   also true that "the legislature is better equipped to make . . . empirical judgments [as to

25   contribution limits], as legislators have 'particular expertise' in matters related to the costs and

26   nature of running for office." *Randall*, 548 U.S. at 248. Nonetheless, as the above discussion

27   demonstrates, it appears that the $1,000 limit in this case on contributions by political parties

28   would have "dramatic adverse effect on the funding of campaigns." *See Buckley*, 424 U.S. at 21.

The limit is only twice that of the limit on individual contributions.  Indeed, this limit appears to be so low and so restrictive, that it fares no better than the City's prior complete ban on contributions by political parties.  Although some contribution is undoubtedly better than a complete ban, it appears to the Court that in passing this limit, the City gave "no weight at all" to the required balance between: (1) "the need to allow individuals to participate in the political process by contributing to political parties that help elect candidates" with (2) "the need to prevent the use of political parties 'to circumvent contribution limits that apply to individuals.'"  *See Randall*, 548 U.S. at 258-59 (citation omitted).  Just like in *Randall*, the low contribution limit "'reduce[s] the voice of political parties' in [San Diego] to a 'whisper.'"  *See id.* at 259 (citation omitted).

At this time, the Court cannot say whether a $5,000 or $20,000 limit on contributions by political parties would be sufficient to pass the constitutional muster under *Randall*.  Whatever the new limit the City decides to enact, it would be required to demonstrate that it seriously engaged in the required balancing of the interests set forth above.  *See Randall*, 548 U.S. at 258-59.  One thing is for sure, however—that balancing is lacking with respect to the $1,000 limit in § 27.2934(b).  Looking at the *Randall* factors, those factors "[t]aken together" suggest that the $1,000 limit in this case "threaten[s] to inhibit effective advocacy" by challengers and "mute[s] the voice of political parties."  *See id.* at 261-62.  When compared to the limits existing in many other cities, as well as on the state and national level, this appears to be precisely the "difference[] in kind" that the Supreme Court in *Buckley* suggested would be "significant."  *See* 424 U.S. at 30.

For the foregoing reasons, the Court **GRANTS** Plaintiffs' motion for summary judgment as to § 27.2934(b), and **DENIES** the City's respective motion.

C.      Non-individuals other than political parties

The parties next contest the validity of the contribution ban on non-individuals other than political parties, including for-profit and nonprofit corporations.  The City argues that this contribution ban is permissible under the Supreme Court's decision in *Beaumont*, 539 U.S. 146.  Plaintiffs, on the other hand, point to the Supreme Court's recent decision in *Citizens United*, 130 S. Ct. 876, in arguing that the City cannot allow some persons to contribute, but not others, solely on the identity of the person who wants to make the contribution.

This case is controlled by *Beaumont*.  In *Beaumont*, the Supreme Court upheld the federal ban on direct contributions by corporations to candidates as applied to a nonprofit advocacy corporation.  539 U.S. at 149.  In doing so, the Supreme Court noted that "[a]ny attack on the federal prohibition of direct corporate political contributions goes against the current of a century of congressional efforts to curb corporations' potentially 'deleterious influences on federal elections,' which we have canvassed a number of times before." *Id.* at 152 (citing cases).  According to the Supreme Court, the prohibition on direct corporate contributions was justified by "the 'special characteristics of the corporate structure' that threaten the integrity of the political process." *Id.* at 153.  It was necessary to "'prevent corruption or the appearance of corruption.'" *Id.* at 154 (citation omitted).  Moreover, it was necessary to prevent the use of corporations "as conduits for 'circumvention of valid contribution limits.'" *Id.* at 155 (citation omitted).

The Supreme Court in *Beaumont* also noted that the prohibition was permissible because it concerned *contributions* by corporations, rather than *independent spending*, and therefore was subject to a lesser degree of scrutiny.  *See id.* at 159, 161-62.  Going further, the Supreme Court suggested that "[w]ithin the realm of contributions generally, corporate contributions are furthest from the core of political expression, since corporations' First Amendment speech and association interests are derived largely from those of their members, and of the public in receiving information." *Id.* at 162 n.8 (internal citations omitted).  "A ban on direct corporate contributions leaves individual members of corporations free to make their own contributions, and deprives the public of little or no material information." *Id.*

Contrary to Plaintiffs' arguments, rather than cast doubt on *Beaumont*, the Supreme Court's recent decision in *Citizens United* reaffirmed its principle.  In *Citizens United*, 130 S. Ct. 876, the Supreme Court held unconstitutional federal prohibition on independent expenditures by corporations as applied to a nonprofit corporation.  In doing so, the Supreme Court took great pains to emphasize that what was involved (i.e., a prohibition on *independent expenditures*) went to the core of the First Amendment's right to free speech.  *Id.* at 898-900.  Indeed, in noting that the prohibition on independent corporate expenditures arose only in 1947, the Supreme Court emphasized that the state and federal bans on corporate *direct contributions* were in place "[a]t

least since the latter part of the 19th century." *Id.* at 900.  Later in the opinion, the Supreme Court

again highlighted that what was involved in the case before it was a prohibition on independent

expenditure, and not on direct contributions previously upheld:

> [T]he Court in [*Federal Election Commission v. National Right to Work Committee* ("*NRWC*")] did say there is a "sufficient" governmental interest in "ensur[ing] that substantial aggregations of wealth amassed" by corporations would not "be used to incur political debts from legislators who are aided by the contributions."  *NRWC*, however, has little relevance here.  *NRWC* decided no more than that a restriction on a corporation's ability to solicit funds for its segregated PAC, which made direct contributions to candidates, did not violate the First Amendment.  ***NRWC* thus involved contribution limits, which, unlike limits on independent expenditures, have been an accepted means to prevent *quid pro quo* corruption.**  Citizens United has not made direct contributions to candidates, and it has not suggested that the Court should reconsider whether contribution limits should be subjected to rigorous First Amendment scrutiny.

*Id.* at 909 (internal citations omitted) (emphasis added).

For the foregoing reasons, the Court agrees with the City that this case is controlled by

*Beaumont*, which was not overruled in *Citizens United*, and therefore the complete prohibition on

direct corporate contributions is justified by the City's important anti-corruption and anti-

circumvention interests. *See Beaumont*, 539 U.S. at 154-55.  As the Supreme Court stated, "[a]

ban on direct corporate contributions leaves individual members of corporations free to make their

own contributions, and deprives the public of little or no material information."  *Id.* at 162 n.8.

To the extent Plaintiffs rely on a district court's decision in *United States v. Danielczyk*,

788 F. Supp. 2d 472 (E.D. Va. 2011), *clarified on denial for reconsideration*, 791 F. Supp. 913

(E.D. Va. 2011), for a contrary proposition, the Court declines to follow that decision.  In

*Danielczyk*, the district court reasoned that "[i]f human beings can make direct campaign

contributions within FECA's limits without risking *quid pro quo* corruption or its appearance, and

if, in *Citizens United*'s interpretation of *Bellotti*, corporations and human beings are entitled to

equal political speech rights, then corporations must also be able to contribute within FECA's

limits."  *Id.* at 494.  As noted above, however, the Supreme Court in *Citizens United* only

addressed the rights of a corporation vis-a-vis individuals as applied to *independent expenditures*,

not direct contributions.[12]  Moreover, whatever doubt might exist as to the continuing validity of *Beaumont*, it is not up to this Court to overrule Supreme Court's decisions that have been potentially called into doubt.  *See Agostini v. Felton*, 521 U.S. 203, 237 (1997) ("We do not acknowledge, and we do not hold, that other courts should conclude our more recent cases have, by implication, overruled an earlier precedent.  We reaffirm that 'if a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions.'" (citation omitted)).

For the foregoing reasons, the Court **GRANTS** the City's motion for summary judgment as to §§ 27.2950 and 27.2951, to the extent those provisions ban contributions from non-individuals other than political parties, and **DENIES** Plaintiffs' respective motion.

D.     Attribution requirement

Finally, Plaintiffs seek summary judgment as to the attribution requirement in § 27.2936(b), which requires that any contribution used by a general purpose recipient committee be "attributable to an individual in an amount that does not exceed $500 per candidate per election." Because a political party qualifies as "general purpose recipient committee," Plaintiffs first seek to hold the attribution requirement unconstitutional as applied to political parties.  Plaintiffs next contend it is also unconstitutional to the extent it limits the contributions that political parties from non-individuals, such as corporations, labor unions, and other entities.  The City argues this issue is not ripe for judicial review because the City has decided not to enforce § 27.2936(b)'s attribution requirement as to political parties, as long as the $1,000 party contribution limit is in effect.  (*See* Declaration of Stacey Fulhorst in Support of Defendant's Response to Supplemental Authority ¶ 4 [Doc. No. 103-1].)  The City makes no other argument in support of the requirement.

First, in light of the Court's grant of summary judgment in Plaintiffs' favor as to the $1,000

---

[12] As the district court in *Danielczyk* acknowledged, its conclusion was in conflict with at least one other district court.  *See Minnesota Citizens Concerned for Life, Inc. v. Swanson*, 741 F. Supp. 2d 1115, 1132-34 (D. Minn. 2010) ("The Court concludes that the *Citizens United* ruling does not extend so far as to invalidate Minnesota's ban on direct corporate contributions."), *affirmed*, 640 F.3d 304 (8th Cir. 2011), *rehearing en banc granted & opinion vacated* (July 12, 2011).  In addition, most recently, the Second Circuit in *Ognibene*, — F.3d —, 2012 WL 89358, at *15 n.21, declined to follow the conclusion reached by the district court in *Danielczyk*.

1    limit on contributions by political parties, the Court rejects the City's ripeness argument.

2         Second, to the extent political parties seek to receive contributions so that they could make

3    *independent expenditures*, this question is resolved by the prior discussion of § 27.2936(b), where

4    the Court granted Plaintiffs summary judgment against enforcement of the $500 individual

5    contribution limit as applied to committees making independent expenditures. *See supra* Part IV.

6    Accordingly, to the extent they are making independent expenditures, political parties may—just

7    like other independent expenditure committees—solicit more than $500 from each contributor.

8    Moreover, they may accept contributions from individuals and non-individuals alike. *See Citizens*

9    *United*, 130 S. Ct. at 913 (striking down restrictions on corporate independent expenditures).

10        The next question is whether the Court should enjoin the application of § 27.2936(b)'s

11   attribution requirement as applied to political parties seeking individual contributions *so as to*

12   *make their own direct contributions to candidates*.  Thus framed, the attribution requirement is

13   permissible.  Despite Plaintiffs' arguments to the contrary, what is involved here is *not*

14   contributions by political parties, but rather the contributions that they can solicit from others.

15   Unlike the former, the City has a strong anti-circumvent interest in preventing the individuals from

16   contributing large amounts of money to the political parties in circumvention of their own

17   individual direct contribution limits.  Notably, in *California Medical Association v. Federal*

18   *Election Commission*, 453 U.S. 182, 195-99 (1981) ("*Cal. Med.*"), the Supreme Court upheld a

19   $5,000 annul limit imposed on the amount that individuals and unincorporated entities could

20   contribute to political committees.  That decision is controlling here.  To paraphrase *Cal. Med.*,

21   "[i]f the First Amendment rights of a contributor are not infringed by [the $500 limit on his

22   contributions to] . . . a particular candidate, the rights of a contributor are similarly not impaired by

23   [the $500 limit on his contributions] . . . to a [political party], which advocates the views and

24   candidacies of a number of candidates."  *See id.* at 197.  Thus, to the extent they accept individual

25   contributions to make direct contributions to the candidates, political parties—just like other

26   independent expenditure committees—must abide by the source and amount limitations contained

27   in § 27.2936(b).  *See Emily's List*, 581 F.3d at 12.

28        Finally, to the extent Plaintiffs challenge § 27.2936(b)'s requirement that the contributions

be attributable to "individuals," the Court rejects any such challenge in light of its prior conclusion that such prohibitions are consistent with *Beaumont*, 539 U.S. at 154-55.[13]  *See supra* Part V.C.  As previously indicated, this attribution requirement is permissible only to the extent political parties seek to make direct contributions to candidates, and does not apply when they accept contributions to make independent expenditures.  *See Emily's List*, 581 F.3d at 12; *see also Citizens United*, 130 S. Ct. at 913 (invalidating restrictions on corporate independent expenditures).

Accordingly, the Court **DENIES** Plaintiffs' motion to the extent it challenges the attribution requirement of § 27.2936(b) as it applies to political parties making direct contributions to candidates, but **GRANTS** the motion to the extent it challenges the attributions requirement as it applies to political parties making independent expenditures.

## CONCLUSION

The Court rules as follows on the parties' cross-motions for summary judgment:

Count 1 (§ 27.2938(a) = candidates prohibited spending their own money prior to the twelve-month period) — **GRANTED** for Plaintiffs.

Count 2 (§ 27.2938(a) = making and accepting contributions prior to the twelve-month period) — **GRANTED** for Defendants and **DENIED** for Plaintiffs.

Count 3 (§ 27.2935(a) = $500 limit on individual contributions to candidates) — **GRANTED** for Defendants and **DENIED** for Plaintiffs.

Count 4 (§§ 27.2950 & 27.2951 = ban on contributions to candidates by political parties) — **GRANTED** for Plaintiffs and **DENIED** for Defendants.

Count 5 (§§ 27.2950 & 27.2951 = ban on contributions to candidates by non-individuals other than political parties) — **GRANTED** for Defendants and **DENIED** for Plaintiffs.

Count 6 (§ 27.2936(b) = $500 limit on individual contributions to committees making independent expenditures) — **GRANTED** for Plaintiffs.  This includes contributions by individuals and non-individuals to political parties making independent expenditures.  This does

---

[13] As previously indicated, the requirement that contributions be attributable to "individuals" is permissible only to the extent political parties seek to make direct contributions to candidates, and does not apply when political parties accept contributions to make independent expenditures.  *See Citizens United*, 130 S. Ct. at 913; *see also Emily's List*, 581 F.3d at 12.

1  not include the $500 limit on individual contributions to these committees *to the extent those*

2  *committees make direct contributions to candidates*, which the City may continue to enforce.

3       Count 7 (§ 27.2936(b) = ban on contributions by non-individuals to committees making

4  independent expenditures) — **GRANTED** for Plaintiffs.  This includes contributions by non-

5  individuals to political parties making independent expenditures.

6       Count 8 (§ 27.2934(b) = $1,000 limit on contributions to candidates by political parties) —

7  **GRANTED** for Plaintiffs and **DENIED** for Defendants.

8       Count 9 (§ 27.2936(b) = §500 individual limit on contributions to political parties making

9  direct contributions to candidates) — **GRANTED** for Defendants and **DENIED** for Plaintiffs.

10       **IT IS SO ORDERED.**

11  **Date:   January 20, 2012**

12             **IRMA E. GONZALEZ, Chief Judge**
           **United States District Court**

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28